**Sylvester SASNETT, Will Highfill, Lonnie Smith, James Lowery, James Hadley, John Casteel and Barbara Miller, et al., individually and on behalf of others similarly situated, Plaintiffs,**

**and**

**United States of America, Intervenor,**

**v.**

**DEPARTMENT OF CORRECTIONS of the State of Wisconsin, Michael J. Sullivan, Secretary, Department of Corrections; Ken Sondalle, Administrator, Division of Adult Institutions; Jeffrey Endicott, Warden, Columbia Correctional Institution; Gary McCaughtry, Warden,**

Waupun Correctional Institution, Gerald Berge, Warden, Fox Lake Correctional Institution; Kristine Krenke, Warden, Taycheedah Correctional Institution; their agents, assistants, officials, employees, successors and others acting in concert with them, Defendants.

No. 94–C–052–C.

United States District Court, W.D. Wisconsin.

June 23, 1995.

**1308**

Percy L. Julian, Julian, Olson & Lasker, S.C., Madison, WI, for Sylvester Sasnett, Will Highfill, Lonnie Smith, James Lowery, James Hadley, John Casteel, and Barbara Miller.

Frank Remington, Wisconsin Dept. of Justice, Madison, WI, for Dept. of Corrections, Michael J. Sullivan, Ken Sondalle, Jeffrey Endicott, Gary McCaughtry, Gerald Berge, and Kristine Krenke.

Janis C. Kestenbaum, Theodore C. Hirt, U.S. Dept. of Justice, Washington, DC, for U.S.A.

Marc D. Stern, American Jewish Congress, Stephen Wise Congress House, New York City, for American Jew. Cong. (amicus curiae).

CRABB, Chief Judge.

This is a civil action for injunctive and declaratory relief brought pursuant to 42 U.S.C. § 1983 and the Religious Freedom Restoration Act, 42 U.S.C. § 2000bb. Plaintiffs are Wisconsin state prisoners who challenge several internal management procedures, emergency rules and permanent administrative rules regulating the types and amounts of personal property they may possess while in prison. They contend that the enforcement of these procedures and rules violates their constitutional rights to due process, of access to the courts, to equal protection under the law and of free exercise of their religions under the Constitution and the Religious Freedom Restoration Act.[1] In addition, plaintiffs contend that the regulations are unconstitutionally vague and overbroad.

Defendants have moved pursuant to Fed. R.Civ.P. 12(b)(6) for partial dismissal of plaintiffs' claims on the grounds that 1) the complaint fails to state a Fourteenth Amendment due process claim because plaintiffs lack a legitimate claim of entitlement to the regulated property; 2) the complaint fails to state an access to courts claim because it does not include allegations from which prejudice might be inferred; 3) the claims brought pursuant to the Religious Freedom Restoration Act must be dismissed either because the act is unconstitutional or in the alternative, because plaintiffs have failed to allege deprivation of property "essential" to the exercise of their religions and the regulations further a compelling state interest; and 4) plaintiffs' allegations of denial of treatment afforded the plaintiffs in *Braun v. Department of Corrections*, No. 92–CV–3496, fail to state an equal protection claim. Finally, defendants contend that they are immune from liability for damages on all of plaintiffs' claims because the law defendants are alleged to have violated was not clearly established at the time.

---

1. The named plaintiffs represent a certified class of inmates on all claims except those alleging a denial of access to the courts and a violation of their rights to free religious exercise.

I conclude that defendants' motion must be granted with respect to plaintiffs' access to the courts claims and equal protection claims and denied in all other respects. Plaintiffs' amended complaint does not contain a request for money damages, making it unnecessary to reach the merits of defendants' qualified immunity defense. Because sovereign immunity bars claims brought directly against the state, defendant Department of Corrections will be dismissed on the court's own motion. Construing the amended complaint liberally, I find that it fairly alleges the following.

## ALLEGATIONS OF FACT

Plaintiff Sylvester Sasnett is a prisoner at Columbia Correctional Institution in Portage, Wisconsin; plaintiffs Will Highfill and Lonnie Smith are incarcerated at Fox Lake Correctional Institution in Fox Lake, Wisconsin; plaintiffs James Lowery, James Hadley and John Casteel are imprisoned at Waupun Correctional Institution in Waupun, Wisconsin; and plaintiff Barbara Miller is currently incarcerated at the Outagamie County jail in Appleton, Wisconsin, but was a state prisoner at Taycheedah Correctional Institution in Fond du Lac, Wisconsin, during the period when defendants' challenged rules went into effect.[2]

Defendant Department of Corrections is a department of the State of Wisconsin. Defendant Michael Sullivan is the Secretary of the Department of Corrections. Defendant Ken Sondalle is the administrator of the Division of Adult Institutions of the Department of Corrections. Defendants Jeffrey Endicott, Gary McCaughtry, Gerald Berge and Kristine Krenke are the wardens of Columbia Correctional Institution, Waupun Correctional Institution, Fox Lake Correctional Institution and Taycheedah Correctional Institution, respectively. All defendants are responsible for enforcing the rules and procedures of the Department of Corrections.

The Department of Corrections and individual prisons regulate and restrict inmates' rights to acquire and possess personal property by several means: administrative rules promulgated pursuant to chapter 227 of the Wisconsin Statutes; internal management procedures, which are not promulgated according to statute and are not legislative rules of conduct; emergency rules, which are published, but temporary, and not legislative rules of conduct; and institution handbooks containing various rules, internal management procedures and ad hoc policies or procedures. There may be overlap and variation among the administrative rules, internal management procedures and the institution handbooks.

On May 1, 1992, the administrator of the Department of Corrections, Division of Adult Institutions, issued a memorandum to all wardens and superintendents entitled "Revised Internal Management Procedures Relating to Inmate Personal Property and Clothing." The memo contained revised inmate personal property and clothing procedures that became effective on June 1, 1992, although inmates incarcerated on that date were given until June 1, 1993, to come into compliance. The changes included limiting the amount of personal and state-issued property an inmate may possess to that able to fit into a box no larger than $32'' \times 16'' \times 16''$ (excluding electronic equipment, typewriters, fans or other large items).

Under Internal Management Procedure DOC 309 IMP # 1–D, inmates are forbidden from wearing earrings, necklaces, bracelets, ankle bracelets and pins, including religious jewelry such as crucifixes. Internal Management Procedure DOC 309 IMP # 4 prohibits inmates from possessing more than 25 books, magazines, newspapers or periodicals, including religious publications, and requires that inmates purchase all reading materials through approved retail outlets or publishers. Under Internal Management Procedure DOC 309, IMP # 1–B, computers are forbidden and typewriters, although permitted, may not have memory or text storage capability and must be purchased from approved retail outlets with the prior permission of

---

2. It is unclear whether Miller has any standing to sue because she is no longer incarcerated in a Wisconsin state prison and plaintiffs are not seeking monetary damages. However, on the present record, I cannot determine whether the challenged regulations still apply to her.

prison officials. This rule requires inmates to rely on technologically inferior items that are increasingly difficult to obtain and increases the time required to prepare legal documents and requires inmates to store needed legal materials in hard copy form.

On August 31, 1992, the Wisconsin State Public Defender filed *Braun v. Department of Corrections,* No. 92–CV–3496, in Dane County Circuit Court on behalf of five inmates, one of whom is a litigant in this action (James Lowery), challenging the validity of the internal management procedures. On May 26, 1993, just before the compliance date for most prisoners, Dane County Circuit Judge Moria Krueger enjoined the Department of Corrections from enforcing the internal management procedures against the *Braun* plaintiffs on the ground that it was probable the procedures were not promulgated in accordance with state law. In response, on July 30, 1993, the Department of Corrections promulgated emergency rules restricting inmates' possession of personal property. On August 18, 1993, Judge Krueger granted the *Braun* plaintiffs' motion for summary judgment, holding that the internal management procedures were promulgated in violation of state law. Defendants did not apply the internal management procedures to the five named plaintiffs in *Braun* but did apply the procedures to all other inmates. The plaintiffs in *Braun* then challenged the emergency rule, and on or about September 17, 1993, the *Braun* defendants agreed by stipulation not to enforce the emergency rules against them. The emergency rules were applied to all other inmates.

On June 1, 1994, the emergency rules expired and new permanent property rules went into effect. One of the rules, Wis.Admin.Code § DOC 309.35(3), directs prison wardens to develop policies and procedures relating to the acquisition, possession and use of personal property by inmates, to make a list of personal property items permitted at their institutions and to determine the permissible methods by which personal property may be acquired. Subsection (3)(d) forbids inmates from possessing more personal property than can fit into a receptacle 32″ × 16″ × 16″, or 8192 cubic inches, excluding medi-cally prescribed items, hobby materials, legal materials, electronic equipment, typewriters, fans or other "large items." Subsection (3)(e) requires that an inmate's hobby materials fit into a receptacle 14″ × 14″ × 14″, or 2744 cubic inches, excluding one over-sized item. Subsection (3)(f) requires that an inmate's legal materials fit into a receptacle no larger than 20″ × 20″ × 20″, or 8000 cubic inches, and allows wardens to authorize additional storage space on a temporary basis "upon a demonstrated need in connection with on-going litigation and consistent with fire codes and regulations." Wis.Admin.Code § DOC 303.47 provides for the discipline of inmates who possess contraband and defines contraband as any items not included on "the posted list" of permissible inmate possessions, items not listed on the inmate's property list and items not belonging to the inmate.

The Department of Corrections continues to use internal management procedures and informal policies in addition to permanent rules.

Because of the new property restrictions, plaintiff Sasnett was required to relinquish approximately eleven religious books, including *The Amplified Bible,* volumes 1 through 3 of the *Jamison, Fauset Brown Commentary,* the *Inductive Study Bible,* the *NIV Interliner Greek–English New Testament* and the *NIV Interliner Hebrew–English Old Testament.* These religious books were sent out of the prison to or with Sasnett's pastor. Sasnett also gave up a gold crucifix on a 24″ gold chain.

Plaintiff Highfill is currently preparing to bring a *pro se* habeas corpus challenge to his criminal conviction. Because of the threatened enforcement of the space restrictions on legal materials, Highfill sent large amounts of legal materials, including trial transcripts and research materials, out of the prison at a personal expense of over $100. Highfill was also forced to dispose of his memory typewriter. These restrictions made it more difficult for him to prepare his habeas case.

When plaintiff Lonnie Smith learned of the new property restrictions, he gave a visitor two gold chains with crosses on them, each made of 14 carat gold. Smith participated in

church activities at Fox Lake Correctional Institution.

Plaintiff James Lowery was a plaintiff in the *Braun* case and therefore was not subject to either the internal management procedures or the emergency rules, but he is subject to the permanent rules. Because of the new rules, Lowery disposed of religious and legal books and magazines, legal reference materials and materials from a paralegal course. Lowery had spent approximately $800 to purchase the reading materials he gave up. He has filed an inmate complaint challenging the property restrictions.

In August or September 1992, plaintiff John Casteel shipped approximately eight shopping bags of legal materials from Waupun Correctional Institution at his own expense to comply with the property restrictions. He also gave legal research materials and photocopies of cases to a visitor. Casteel has two conditions of confinement cases pending before the Wisconsin Court of Appeals, another case in Dodge County Circuit Court and an appeal from a criminal case in the Court of Appeals for the Seventh Circuit. Casteel is proceeding *pro se* in each case. Casteel has filed an inmate complaint regarding the property restrictions.

Because of the new rules, plaintiff James Hadley was forced to dispose of several Jehovah's Witness pamphlets. Plaintiff Barbara Miller gave her cross to a visitor in order to comply with the new restrictions on jewelry. Miller filed an inmate complaint to challenge the prohibition on wearing crosses. Her complaint was denied, appealed and denied again on the ground that the cross was gang related.

## OPINION

In ruling on a motion to dismiss under Fed.R.Civ.P. 12(b)(6), the court must construe the complaint in the light most favorable to plaintiffs, drawing all reasonable inferences in their favor. *Ellsworth v. City of Racine*, 774 F.2d 182, 184 (7th Cir.1985); *Mathers Fund, Inc. v. Colwell Co.*, 564 F.2d 780, 783 (7th Cir.1977). The complaint need only comply with "notice pleading" standards: plaintiffs are required to do no more than give notice to defendants of their theory behind their claims and allege the basic facts supporting those claims. *Maclin v. Paulson*, 627 F.2d 83, 86 (7th Cir.1980). Plaintiffs will be found to have stated a valid claim unless it appears beyond a doubt that they can prove no set of facts that would entitle them to relief. *Harriston v. Chicago Tribune Co.*, 992 F.2d 697, 701 (7th Cir.1992); *Ellsworth*, 774 F.2d at 184.

### A. *Due Process*

The Fourteenth Amendment prohibits states from depriving persons of life, liberty, or property without due process of law. The constitutional protections afforded by the due process clause are not extinguished upon incarceration. *Hudson v. Palmer*, 468 U.S. 517, 539, 104 S.Ct. 3194, 3206–07, 82 L.Ed.2d 393 (1984) (O'Connor, J., concurring). A valid due process claim has three prerequisites: 1) a deprivation 2) of a property or liberty interest 3) by officials acting under color of state law. *Parratt v. Taylor*, 451 U.S. 527, 536–37, 101 S.Ct. 1908, 1913–14, 68 L.Ed.2d 420 (1981).

Defendants' motion to dismiss plaintiffs' due process claims is grounded on their contention that plaintiffs lack a protectable interest in the property. According to defendants, the regulatory limits on inmates' ability to possess personal property define the degree to which the inmates possess an interest in their property; therefore, plaintiffs lack a legitimate claim of entitlement to possess any property proscribed by the rules. Plaintiffs respond that their due process claim does not extend to all property subject to the regulations at issue but only to religious and legal materials, as to which due process rights flow from both a property and liberty interest in the materials arising from the Religious Freedom Restoration Act and the First and Fourteenth Amendments.

For purposes of the due process clause, property interests must be found in state or federal law; they are not created by the Constitution. *Board of Regents v. Roth*, 408 U.S. 564, 577, 92 S.Ct. 2701, 2709, 33 L.Ed.2d 548 (1972); *Thornton v. Barnes*, 890 F.2d 1380, 1386 (7th Cir.1989). To establish a property interest, plaintiffs would have to show that they have a "legitimate claim of

entitlement" to the religious and legal property at issue. *Roth,* 408 U.S. at 577, 92 S.Ct. at 2709 ("To have a property interest . . . a person clearly must have more than an abstract need or desire."). A property interest exists in that which is "securely and durably [one's own] under . . . law, as distinct from what [one] hold[s] subject to so many conditions as to make [one's] interest meager, transitory or uncertain." *Long Grove Country Club Estates, Inc. v. Village of Long Grove,* 693 F.Supp. 640, 653 (N.D.Ill.1988) (quoting *Reed v. Village of Shorewood,* 704 F.2d 943, 948 (7th Cir.1983)). "Mere desire or expectation . . . falls short of a constitutionally protected property interest." *Cohen v. City of Des Plaines,* 742 F.Supp. 458, 470 (N.D.Ill.1990), *rev'd on other grounds,* 8 F.3d 484 (7th Cir.1993).

 Inmates have a property interest in their own personal possessions. *Campbell v. Miller,* 787 F.2d 217, 222 (7th Cir.1986), *cert. denied,* 479 U.S. 1019, 107 S.Ct. 673, 93 L.Ed.2d 724 (1986). Defendants do not contest this but argue that plaintiffs have no legitimate property interest in *possessing* their personal property behind the prison gates. Plaintiffs make the untenable argument that an interest in possessing their property in prison arises from the First Amendment. *Roth,* 408 U.S. at 577, 92 S.Ct. at 2709. They also assert that property interests arise from the Religious Freedom Restoration Act, but the act has no bearing on plaintiffs' legal materials, and I conclude that it does not give rise to a cognizable property interest even with regard to plaintiffs' religious materials. Any asserted right to possess religious materials under the Religious Freedom Restoration Act would arise only from the property's link to the liberty of freely exercising one's religious practices. Plaintiffs do not point to, and I cannot identify any state law giving rise to a protectible property interest in the materials. To the contrary, state law *embodies* the prescriptions at issue. *See Escobar v. Landwehr,* 837 F.Supp. 284, 288–89 (W.D.Wis.1993) (neither Wisconsin statutes nor the administrative code give rise to protectable property interest in materials banned under the new Internal Management Procedures). Therefore, I conclude that plaintiffs have no property interests in possessing the materials at issue.

 Liberty interests are a different matter altogether. Unlike property interests, liberty interests can arise from the Constitution. *Shango v. Jurich,* 681 F.2d 1091, 1097 (7th Cir.1982). The right to "liberty" guaranteed by the Fourteenth Amendment denotes a freedom "to worship God according to the dictates of [one's] own conscience," *Roth,* 408 U.S. at 572, 92 S.Ct. at 2707, as well as the right to petition the courts for redress. *Williams v. Lane,* 851 F.2d 867, 881 (7th Cir.1988), *cert. denied,* 488 U.S. 1047, 109 S.Ct. 879, 102 L.Ed.2d 1001 (1989). The Religious Freedom Restoration Act manifests a congressional intent to protect the liberty of free religious exercise embodied in the First Amendment. 42 U.S.C. § 2000bb(a) and (b). Therefore, if defendants are violating plaintiffs' right to gain access the courts or to exercise their religions, defendants are infringing upon constitutionally protected liberty interests. *Williams,* 851 F.2d at 880–81 (violation of inmates' rights of access to the courts and rights to freely exercise their religion constituted deprivation of liberty interests without due process), raising the question of what process is due.

In holding that plaintiffs may be entitled to due process, I express no views on whether the challenged restrictions are related reasonably to a legitimate governmental purpose. I hold only that plaintiffs may have a cognizable liberty interest in their religious and legal materials. Accordingly, defendants' motion to dismiss plaintiffs' due process claims is denied.

### B. *Access to the Courts*

 The law governing prisoners' rights of access to the courts has been clearly defined. Prisoners have a constitutional right of access to the courts for pursuing post-conviction remedies and for challenging the conditions of their confinement. *Campbell v. Miller,* 787 F.2d at 225 (citing *Bounds v. Smith,* 430 U.S. 817, 97 S.Ct. 1491, 52 L.Ed.2d 72 (1977)); *Wolff v. McDonnell,* 418 U.S. 539, 578–80, 94 S.Ct. 2963, 2986–87, 41 L.Ed.2d 935 (1974); *Procunier v. Martinez,* 416 U.S. 396, 419, 94 S.Ct. 1800, 1814, 40

L.Ed.2d 224 (1974); *Johnson v. Avery,* 393 U.S. 483, 485, 89 S.Ct. 747, 748–49, 21 L.Ed.2d 718 (1969). This right is significant, but not unconditional. *Green v. Warden, U.S. Penitentiary,* 699 F.2d 364, 369 (7th Cir.1983), *cert. denied,* 461 U.S. 960, 103 S.Ct. 2436, 77 L.Ed.2d 1321 (1983). The constitutionally relevant benchmark is "meaningful" access, not total or unlimited access. *Bounds,* 430 U.S. at 823, 97 S.Ct. at 1495. "Meaningful" access has been interpreted as having access to an adequate law library or a lawyer, but not necessarily both. *Gometz v. Henman,* 807 F.2d 113, 116 (7th Cir.1986) (prison officials may eliminate one kind of protection—be it inmate writ-writers or prison libraries—if they supply adequate substitutes, such as lawyers).

■ An inmate forced to endure a "substantial and continuous" limitation on access to legal materials and counseling need not make a separate showing of individual prejudice caused by the state's interference with his constitutional right; however, an inmate who suffers only sporadic or insubstantial interference with his right of access to the courts must show how the interference caused him specific prejudice. *Jenkins v. Lane,* 977 F.2d 266 (7th Cir.1992); *DeMallory v. Cullen,* 855 F.2d 442, 446 (7th Cir.1988). In *Jenkins,* the Court of Appeals for the Seventh Circuit defined "substantial and continuous" to mean "any restriction on counsel or legal materials that completely prevents the prisoner, or a person acting in the prisoner's behalf, from performing preliminary research." 977 F.2d at 269. Under *Jenkins,* any claim of partial access puts the claim in a "minor or incidental" limitations category, requiring a showing of prejudice.

Will Highfill, James Lowery and John Casteel are the three plaintiffs who claim their access to the courts has been impaired. In these claims they challenge two distinct set of prison regulations: 1) the denial of computers and memory typewriters; and 2) the limits on the amount of legal materials an inmate may possess.

■ The computers and memory typewriter claims must be dismissed as a matter of law. The right of access to the courts incorporates a right to state-supplied pen and paper to draft legal documents, *Bounds,* 430 U.S. at 824, 97 S.Ct. at 1496, but does not require such sophisticated tools as computers and memory typewriters. *See Sands v. Lewis,* 886 F.2d 1166 (9th Cir.1989) (no constitutional right to memory typewriters); *cf. United States ex rel. v. Lane,* 718 F.2d 226, 232 (7th Cir.1983) (criminal defendant has no right of access to computerized legal research system upon forgoing right to court appointed counsel). The right of access does not mandate even the provision of ordinary typewriters. *Jackson v. Arizona,* 885 F.2d 639, 641 (9th Cir.1989); *Twyman v. Crisp,* 584 F.2d 352, 358 (10th Cir.1978); *Wolfish v. Levi,* 573 F.2d 118 (2nd Cir.1978), *rev'd on other grounds,* 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1978); *Tarlton v. Henderson,* 467 F.2d 200 (5th Cir.1972); *Inmates, Washington County Jail v. England,* 516 F.Supp. 132, 140 (E.D.Tenn.1980), *aff'd without opinion,* 659 F.2d 1081 (6th Cir.1981).

■ Moreover, the asserted need for more technologically advanced machines is not a claim of a "substantial and continuous" limitation, *see Jenkins,* 977 F.2d at 269; therefore, it requires an allegation supporting an inference of prejudice. No such prejudice has been alleged here. Plaintiff Highfill says that the inability to use his memory typewriter has substantially burdened his ability to prepare a contemplated habeas case, and plaintiffs maintain that memory typewriters and computers quicken the pace of preparing legal documents, but these allegations are insufficient to satisfy the prejudice requirement. *See Bruscino v. Carlson,* 854 F.2d 162, 167 (7th Cir.1988) (citing examples of prejudice as missing a statute of limitations deadline, failing to make a timely filing, being denied legal assistance or losing a case that otherwise could have been won), *cert. denied,* 491 U.S. 907, 109 S.Ct. 3193, 105 L.Ed.2d 701 (1989); *Howland v. Kilquist,* 833 F.2d 639, 642–43 (7th Cir.1987).

■ The challenge to the limit on legal materials an inmate may possess founders for the same reason. Plaintiff Lowery alleges that he had to mail out legal materials in response to the new rules, but he makes no allegation that these materials were essential to pursue a case or that he was otherwise

prejudiced by the loss. Therefore, his claim will be dismissed. Plaintiffs Highfill and Casteel are in a stronger position, because their allegations relate the loss of legal materials to contemplated or pending court cases. Generally, however, an active or contemplated lawsuit or appeal is insufficient to establish prejudice in and of itself. *See Bruscino*, 854 F.2d at 167. Plaintiffs have alleged that the property restrictions have "substantially burdened" their ability to prepare and prosecute their cases, but the allegation is conclusory. As the Court of Appeals for the Seventh Circuit made clear in *Hossman v. Spradlin*, 812 F.2d 1019, 1021–22, ns. 2 and 6 (7th Cir.1986), an inmate who alleges only the loss of legal materials and a pending case has not satisfied the pleading requirements for showing prejudice. Plaintiffs must be able to allege "some quantum of detriment caused by the challenged conduct of state officials resulting in the interruption and/or delay of plaintiff[s'] pending or contemplated lawsuit." *Id.* Plaintiffs' amended complaint makes no such allegation. Therefore, the access to courts claims will be dismissed.

## C. *Free Exercise of Religion*

In 1990, the Supreme Court decided *Employment Division, Department of Human Resources of Oregon v. Smith*, 494 U.S. 872, 875, 110 S.Ct. 1595, 1598, 108 L.Ed.2d 876 (1990), a historic decision involving governmental burdens on the First Amendment right to free religious exercise. At issue was whether the "Free Exercise Clause of the First Amendment permits the State of Oregon to include religiously inspired peyote use within the reach of its general criminal prohibition on use of that drug, and thus permits the State to deny unemployment benefits to persons dismissed from their jobs because of such religiously inspired use." Holding in favor of the state, the Court clarified its view of free exercise doctrine: generally applicable laws that incidentally burden the free exercise of religion need never be justified by a compelling state interest; strict scrutiny is reserved only for those laws that specifically and intentionally target religious practices. *Id.* at 878, 885, 110 S.Ct. at 1603.

Views about *Smith* varied greatly. Some argued that it accurately depicted prior case law, resolving seeming inconsistencies into a coherent and consistent formula. *See e.g.,* Philip A. Hamburger, *A Constitutional Right of Religious Exemption: An Historical Perspective*, 60 Geo.Wash.L.Rev. 915 (1992). Others characterized it as a judicial retrenchment. *See, e.g., Smith*, 494 U.S. 872, 891, 110 S.Ct. 1595, 1606–07 (O'Connor, J., concurring in the judgment); and *id.* at 907, 110 S.Ct. at 1615 (Brennan, Marshall, Blackmun, JJ., dissenting); Matt Pawa, Note, *When the Supreme Court Restricts Constitutional Rights, Can Congress Save Us? An Examination of Section 5 of the Fourteenth Amendment*, 141 U.Pa.L.Rev. 1029, 1034–37 (1993).

For its part, Congress saw the case as retrenchment and responded in 1993 with the Religious Freedom Restoration Act. Finding that *Smith* "virtually eliminated the requirement that the government justify burdens on religious exercise imposed by laws neutral toward religion," 42 U.S.C. § 2000bb(a)(4), Congress attempted to restore what it perceived to be prior law regarding governmental interference with the free exercise of religion, *see* 42 U.S.C. § 2000bb(a)(5) and (b)(1). Borrowing language from Supreme Court precedent on free exercise doctrine, *Sherbert v. Verner*, 374 U.S. 398, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963), and *Wisconsin v. Yoder*, 406 U.S. 205, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972), Congress provided that "[g]overnment shall not substantially burden a person's exercise of religion" unless it demonstrates first that "application of the burden to the person" is the "least restrictive means" available to further a "compelling state interest." 42 U.S.C. § 2000bb-1(b). This rule is precisely the one rejected by the Supreme Court as the outer boundary of the free exercise clause.

Defendants contend that the Religious Freedom Restoration Act is unconstitutional, and in the alternative, that plaintiffs' claims should be dismissed because they are conclusory and because the regulations in question are supported by a compelling state interest. Because it is appropriate to avoid addressing the constitutionality of a statute if possible, *Cohen v. City of Des Plaines*, 8 F.3d

at 493, I will address the second set of arguments first. Plaintiffs Sasnett, Smith and Miller contend that the state's requirement that they give up their cross necklaces substantially burdens their religious exercise and plaintiffs Sasnett, Lowery and Hadley contend that relinquishing their religious books in response to the new rules has substantially burdened their religious practices, in violation of the Religious Freedom Restoration Act. Defendants argue that the claims should be dismissed because "plaintiffs have not alleged in a nonconclusory fashion facts from which this court could infer that the new rules have had a substantial impact on their sincerely held religious beliefs or activities." Defendants' argument highlights the sparseness of the allegations in plaintiffs' complaint: plaintiffs do not identify the religions to which they adhere or explain how their religious practice is substantially burdened by the regulations. However, plaintiffs have alleged that they were forced to give up materials of an obviously religious character, contending that this deprivation substantially burdens their religious exercise. Although plaintiffs could have done a better job of making their claim, defendants have been given sufficient notice of its general nature and I cannot conclude that no set of facts would entitle plaintiffs to relief. *See, e.g., Campos v. Coughlin*, 854 F.Supp. 194 (S.D.N.Y.1994) (plaintiffs likely to succeed on merits of their claim that defendants violated Religious Freedom Restoration Act for failing to allow them to wear Santeria beads).

■ Defendants argue next that plaintiffs' claims should be dismissed because courts should defer to the decisions of prison administrators and interpret the "compelling state interest" defense broadly. There are at least three problems with this argument. First, whether an interest is compelling is a question of fact, not properly decided on a motion to dismiss. Second, the affirmative defense to a Religious Freedom Restoration Act claim has two prongs: even assuming a compelling state interest, the interest may be furthered only by the least restrictive means necessary. *See* 42 U.S.C. § 2000bb–1(b). Defendants have not alleged, much less established, that the means employed here were the least restrictive necessary to fur-

ther the state's interests. Finally, deference to prison administrators notwithstanding, defendants must actually offer a rationale for their actions if they expect the court to find that rationale compelling, a task they have not attempted.

■ Because plaintiffs' claims have survived defendants' other arguments, I must reach the issue of the Religious Freedom Restoration Act's constitutionality. "Deciding whether a matter has in any measure been committed by the Constitution to another branch of government, or whether the action of that branch exceeds whatever authority has been committed, is itself a delicate exercise in constitutional interpretation." *Baker v. Carr*, 369 U.S. 186, 211, 82 S.Ct. 691, 706, 7 L.Ed.2d 663 (1962); *accord Rostker v. Goldberg*, 453 U.S. 57, 64, 101 S.Ct. 2646, 2651, 69 L.Ed.2d 478 (1981). The task requires this court to join an interbranch colloquy that began when the Supreme Court interpreted the Constitution and continued when Congress responded with the passage of the act.

I begin with the presumption that acts of Congress are constitutional. *See Bowen v. Kendrick*, 487 U.S. 589, 617, 108 S.Ct. 2562, 2578–79, 101 L.Ed.2d 520 (1988); *Graham v. Richardson*, 403 U.S. 365, 382–83, 91 S.Ct. 1848, 1857, 29 L.Ed.2d 534 (1971). The key issue is whether § 5 of the Fourteenth Amendment gives Congress the power to pass legislation protecting the free exercise of religion to a greater degree than the Court is willing to read into the free exercise clause. Section 5 provides that "Congress shall have power to enforce, by appropriate legislation, the provisions of this article." It grants Congress a broad but not unlimited ability to legislate in furtherance of equal protection and the Civil War amendments. Supreme Court precedent indicates that § 5 applies fully to the earlier amendments as well. *Hutto v. Finney*, 437 U.S. 678, 98 S.Ct. 2565, 57 L.Ed.2d 522 (1978) (civil rights attorney's fees award statute, 42 U.S.C. § 1988, upheld as valid exercise of Congress' power under § 5 as applied to litigation of Eighth Amendment claim); *see also Belgard v. State of Hawaii*, 1995 WL 170221, 1995

U.S.Dist. LEXIS 4903, No. 93–00961 (D.Haw. Feb. 3, 1995).

When exercising its powers under the Civil War amendments, Congress can prohibit behavior that the Supreme Court has not defined previously as unconstitutional. For example, in *City of Rome v. United States*, 446 U.S. 156, 100 S.Ct. 1548, 64 L.Ed.2d 119 (1980), the Supreme Court upheld § 5 of the Voting Rights Act, which prohibits electoral system changes that carry a racially discriminatory impact, as a valid exercise of Congress's power under the Civil War Amendments, notwithstanding the Court's construction of the Fifteenth Amendment as prohibiting only those voting schemes that are motivated by an intent to discriminate. The Court stated,

> [T]he Act's ban on electoral changes that are discriminatory in effect is an appropriate method of promoting the purposes of the Fifteenth Amendment, even if it is assumed that § 1 of the Amendment prohibits only intentional discrimination in voting. Congress could rationally have concluded that, because electoral changes by jurisdictions with a demonstrable history of intentional racial discrimination in voting create the risk of purposeful discrimination, it was proper to prohibit changes that have a discriminatory impact.

*Id.* at 177, 100 S.Ct. at 1561 (citing *Katzenbach*, 383 U.S. at 335, 86 S.Ct. at 822, and *Oregon v. Mitchell*, 400 U.S. at 216, 91 S.Ct. at 311 (opinion of Harlan, J.)). The issues raised in *City of Rome* are closely analogous to those raised in this case. In both instances, a constitutional provision has been interpreted by the Court as prohibiting only intentionally discriminatory state action and Congress has filled what it considered to be a gap in federal protection by creating a prophylactic buffer zone around the right at issue. In both instances, the buffer zone dispenses with the need to prove state actors' motives simply by prohibiting all state action with discriminatory impact. *See also Oregon v. Mitchell*, 400 U.S. 112, 91 S.Ct. 260, 27 L.Ed.2d 272 (1970) (upholding Congress's complete prohibition of voting literacy test while declining to hold that the Constitution requires such a prohibition); *Katzenbach v.*

*Morgan*, 384 U.S. 641, 86 S.Ct. 1717, 16 L.Ed.2d 828 (1966); *South Carolina v. Katzenbach*, 383 U.S. 301, 86 S.Ct. 803, 15 L.Ed.2d 769 (1966).

Defendants argue that the Religious Freedom Restoration Act is different from other valid exercises of § 5 authority in one key respect: unlike prior congressional enactments, the Religious Freedom Restoration Act is an attempt to force an interpretation of the Constitution onto the federal judiciary, thus violating the separation of powers doctrine and *Marbury v. Madison*, 5 U.S. 137, 1 Cranch 137, 177, 2 L.Ed. 60 (1803) (holding that it is "the province and duty of the judicial department to say what the law is"). Defendants point to the use of the term "restoration" in the act's title, the act's reliance on "constitutional" language from the *Sherbert* and *Yoder* decisions, and the references in the legislative history to the drafters' dissatisfaction with *Smith*.

It is true that the Religious Freedom Restoration Act reflects hostility toward the *Smith* decision: Congress was unhappy with *Smith*, as were many members' constituents, and wanted to avoid what it perceived to be the decision's disastrous effects. But Congress did not display an unequivocal intent to overturn *Smith* by reinterpreting the First Amendment. The legislative history supports an intent to create statutory rights as much as a motive to redefine constitutional ones. *See* H.R.Rep. No. 88, 103rd Cong., 1st Sess. at 1 (1993) (the Religious Freedom Restoration Act creates a "statutory right" ...) and at 9 ("... the legislative branch has been given the authority to provide statutory protection for a constitutional value when the Supreme Court has been unwilling to assert its authority") and at 15 n. 3 ("the label 'restoration' in this context is inappropriate. Congress writes laws—it does not and cannot overrule the Supreme Court's interpretation of the Constitution and thus it is unable to 'restore' a prior interpretation of the First Amendment"); S.Rep. No. 111, 103rd Cong., 1st Sess. at 2 (1993), U.S.Code Cong. & Admin.News 1993, p. 1892 (the Religious Freedom Restoration Act creates a "statutory prohibition" against government action). As for Congress's use of the term "restora-

tion," as a matter of semantics there is no reason why Congress could not *statutorily* "restore" the compelling state interest test: the statute giveth what in Congress's eyes the Supreme Court taketh away.

Even assuming it were possible to pinpoint a singular congressional intent, *see* Frank H. Easterbrook, *Statutes' Domains,* 50 *U.Chi. L.Rev.* 533, 547–48 (1983) (attacking the notion that legislation stems from a "coherent collective choice"), and conclude that Congress attempted to engage in substantive constitutional interpretation, that conclusion would not necessarily jeopardize the act. In *Katzenbach v. Morgan,* 384 U.S. at 652, 86 S.Ct. at 1724, the Court upheld § 4(e) of the Voting Rights Act, which prohibited certain applications of state voter literacy requirements, as a valid exercise of § 5 authority and did so in the absence of any judicially defined constitutional wrongdoing. The Court justified its holding on two grounds: 1) Congress may have determined that the prohibition was necessary to fully enforce the 14th Amendment; or 2) Congress may have determined that the literacy tests at issue constituted an independent violation of the equal protection clause. *Id.* at 656, 86 S.Ct. at 1726. The first rationale is known as *Morgan*'s "remedial" theory of Congress's power under § 5, and it grants Congress the power to remedy or root out unconstitutional activity by prohibiting otherwise constitutional activity. The second holding, representing the Court's "substantive" theory of § 5 authority, assumes Congress can shape the outer contours of the Constitution. "This rationale—the 'second *Morgan* rationale'—holds that Congress can expressly disagree with the Court as to the reach of constitutional rights." Pawa, *Can Congress Save Us?,* supra, at 1061. The only limit *Morgan* placed on this interpretive power was that Congress may not "restrict, abrogate, or dilute" any constitutional guarantees in the process. *Id.* at 651 n. 10, 86 S.Ct. at 1723–24.

The analogy between the facts of *Morgan* and those presented here is compelling. Seven years before the *Morgan* decision, the Supreme Court had determined that a state's requirement of a literacy test did not violate the Constitution absent a showing of an in-

tent to discriminate. *Lassiter v. Northampton Election Bd.,* 360 U.S. 45, 79 S.Ct. 985, 3 L.Ed.2d 1072 (1959). Notwithstanding that earlier opinion, the Court upheld the Voting Rights Act as a valid exercise of Congress's powers under § 5 but declined to overturn *Lassiter. Morgan,* 384 U.S. at 649, 86 S.Ct. at 1722–23. *Lassiter* was to the Voting Rights Act what *Smith* is to the Religious Freedom Restoration Act. In each instance, the Supreme Court had held that states were free to take certain actions that impinged on the ability of individuals either to vote (*Lassiter*), or to practice their religions (*Smith*), and Congress took action to bolster the federal protection of that right. *See also Oregon v. Mitchell,* 400 U.S. 112, 91 S.Ct. 260, 27 L.Ed.2d 272 (upholding a nationwide ban on state literacy requirements as prerequisites to voting without overturning *Lassiter*). Even assuming a greater degree of congressional hostility toward Supreme Court precedent in this instance than in the area of voting rights, I can think of no reason to afford such a distinction constitutional significance.

Defendants argue that case law following *Morgan* has abrogated any interpretive powers Congress once had under § 5. *See Oregon v. Mitchell,* 400 U.S. 112, 91 S.Ct. 260, 27 L.Ed.2d 272 (1970); *EEOC v. Wyoming,* 460 U.S. 226, 103 S.Ct. 1054, 75 L.Ed.2d 18 (1983). Neither of these two decisions, however, abrogates *Morgan*'s substantive theory or dictates an outcome in this case. In the splintered *Mitchell* decision, the Court unanimously sustained the 1970 amendments to the Voting Rights Act banning literacy tests in state and federal elections, and with five concurring judgments, upheld a provision to lower the voting age from 21 to 18 in federal elections and struck the same provision as applied to the states. No clear majority either endorsed or rejected the view that Congress has substantive powers under § 5, although four justices held explicitly that Congress could define the equal protection clause substantively. *Mitchell,* 400 U.S. at 141–44, 91 S.Ct. at 273–75 (Douglas, J.); *id.* at 280–81, 91 S.Ct. at 342–43 (Brennan, J., joined by White and Marshall, JJ.). Indeed, it may be a mistake to read the several opinions of *Mitchell* beyond the facts of that

case, which entailed a federal attempt both to define the equal protection clause in terms wholly unrelated to prior Court precedent and to define state voting qualifications, a core area of state sovereignty as set out in the Constitution itself. *See* Pawa, *Can Congress Save Us?*, supra, at 1074 ("if *Mitchell* does represent a limitation [on Congress's powers under § 5], it is only a limitation on Congress's ability to remedy non-racial discrimination in situations where the Tenth Amendment or other constitutional provisions reserve power to the states").

In *EEOC v. Wyoming*, 460 U.S. 226, 103 S.Ct. 1054, 75 L.Ed.2d 18, the Court upheld application of the Age Discrimination in Employment Act to state and local governments as a valid exercise of Congress's powers under the commerce clause, but the dissenters, including Justices Rehnquist and O'Connor, would have declared it invalid under both the commerce clause and § 5. The dissenting justices considered the Age Discrimination in Employment Act an unconstitutional exercise of Congress's remedial powers under § 5 primarily because the Court had never held that the equal protection clause extends to classes defined by age. *Id.* at 260, 103 S.Ct. at 1073.

A dissenting opinion is not binding precedent; *Morgan* is. Furthermore, the justices who dissented in *EEOC v. Wyoming* declined explicitly to reach the issue whether Congress has substantive powers under § 5: "The ability of Congress to define independently protected classes is an issue that need not be resolved here...." *Id.* n. 6; *see also id.* at 263, 103 S.Ct. at 1074 ("even were we to assume, *arguendo*, that Congress could redefine the Fourteenth Amendment ..."). Because Congress excepted the federal government from the act's coverage, the dissenters were prepared to strike the act as unconstitutional, reasoning that whatever authority Congress had to create constitutional rights did not permit it to extend those rights to some government employees but not others. *Id.* Because the Religious Freedom Restoration Act applies to the federal government in full, it does not suffer from this potential constitutional infirmity. Although the dissent may be prophetic in its less expansive vision of Congress's § 5 powers and although current members of the Supreme Court have expressed a range of individual viewpoints on Congress's § 5 authority, *see Adarand Constructors, Inc. v. Pena,* ——— U.S. ———, ———, 115 S.Ct. 2097, 2114, 132 L.Ed.2d 158 (1995), I am not persuaded that the Supreme Court would hold that Congress has lost its interpretive abilities under § 5 to expand constitutionally guaranteed liberties. *See Belgard v. State of Hawaii,* 1995 WL 170221, 1995 U.S.Dist. LEXIS 4903.

Even if Congress does lacks the power to interpret the Constitution under § 5, the Religious Freedom Restoration Act is best justified as an exercise of Congress's *remedial* powers under § 5. Under this view of the legislation, Congress has not attempted to define the First Amendment; rather, it has merely prohibited otherwise lawful activity as a means of further enforcing constitutional rights. As stated in *City of Rome,* 446 U.S. at 177, 100 S.Ct. at 1561, the proper question is whether Congress could have concluded "rationally," on the basis of the information before it, that neutral regulations with a discriminatory effect "create the risk of purposeful discrimination." So long as the Religious Freedom Restoration Act can be seen as a buffer zone designed to protect and facilitate full enjoyment of the constitutional right to free religious exercise, it does not matter whether Congress was concerned independently with prohibiting behavior that does not violate the free exercise clause.

It seems obvious that the Religious Freedom Restoration Act is a rational means of safeguarding the core constitutional right to free exercise, as judicially defined. Only intentionally discriminatory state actions violate the First Amendment, and it is difficult to prove intentional discrimination. This nation's history is replete with examples of facially neutral, generally applicable laws intended to curb religious practices. Senate Hearings at 70–71, 129; 1992 House Hearings at 332–38. As the United States notes in its brief, "Th[e] testimony [before Congress] established not only that governmental motive is rarely overt, but also that judicial reluctance to impugn the intentions of

state actors facilitates the concealment of illicit motive." *See* H.R.Rep. No. 88 at 6 ("legislative motive often cannot be determined and courts have been reluctant to impute bad motives to legislators"); Testimony of Prof. Laycock, Senate Hearings at 95–96 ("Religious minorities are no safer than racial minorities if their rights depend on persuading a federal judge to condemn the government's motives"); Testimony of Nadine Strossen, American Civil Liberties Union, *id.* at 183, 100 S.Ct. at 1564 ("As members of this committee know from its experience in the field of civil rights, it is much more difficult for someone to prove discriminatory intent than to prove discriminatory effect"). Congress determined that requiring plaintiffs to prove that state actors intended to discriminate on the basis of religion creates an evidentiary barrier to the full protection of constitutional rights. It therefore dispensed with this requirement when it passed the Religious Freedom Restoration Act. It was wholly rational for Congress to have concluded that the Religious Freedom Restoration Act would add greater protection to First Amendment guarantees.

It is worth emphasizing that the only way that the Religious Freedom Restoration Act substantively altered the scope of federal rights to free religious exercise was by obviating proof of discriminatory intent on the part of state actors. Those who see the act as a dramatic intrusion into the judiciary's sphere of constitutional interpretation may overlook the minimal nature of the changes really effectuated. The Religious Freedom Restoration Act came in response to *Smith,* but it does not reflect an interbranch rift over the definition of the underlying right to free exercise of religion. In *Smith,* the Court concerned itself only with what the First Amendment "prohibited." The Court did not find that religiously inspired peyote use did not fall within the amendment's definition of free exercise; it determined simply that only laws intended to inhibit religious practice actually "prohibit" free exercise, as that term is used in the First Amendment. Although it may be hard to distinguish between an underlying right on the one hand, and the constitutional protection afforded that right on the other, in this instance that

distinction was made in *Smith* itself. As its stands currently, there appears to be no disparity between the Court's and Congress's view of the underlying right. *See Smith,* 494 U.S. at 877–88, 110 S.Ct. at 1599–1600 ("the 'exercise of religion' often involves not only belief and profession but the performance of (or abstention from) physical acts: assembling with others for a worship service, participating in sacramental use of bread and wine, proselytizing, abstaining from certain foods or certain modes of transportation."); 42 U.S.C. § 2000bb–2(4) ("the term 'exercise of religion' means the exercise of religion under the First Amendment to the Constitution.") This fact distinguishes the Religious Freedom Restoration Act from the legislative activity at issue in *Mitchell* and *EEOC v. Wyoming,* where Congress was attempting to prohibit certain types of age discrimination even though the Court had never ruled that age was a suspect classification or that the equal protection clause protected against such discrimination. *See EEOC v. Wyoming,* 460 U.S. at 261 n. 7, 103 S.Ct. at 1073 n. 7 (Burger, J., dissenting) (rejecting the government's argument that by applying the rational basis test in prior case law, the court had agreed *sub silentio* that age discrimination was protected by the equal protection clause). Here there is a much stronger nexus between the judicially defined right and the statutory enforcement of that right.

■ Before concluding that the Religious Freedom Restoration Act is a valid exercise of Congress's powers under § 5 of the Fourteenth Amendment, I must consider whether the act violates some other provision of the Constitution. *Morgan,* 384 U.S. at 651 n. 10, 86 S.Ct. at 1723–24 n. 10. Defendants argue that it does, because it imposes a rule of decision on the courts, thereby violating the constitutional separation of powers doctrine. It has been more than a century since the Supreme Court has struck an act of Congress as an unconstitutional rule of decision. In *United States v. Klein,* 80 U.S. (13 Wall.) 128, 20 L.Ed. 519 (1871), the Court reviewed amendments to a statute that allowed Union loyalists to recover property seized during the Civil War, but denied that opportunity to supporters of the confederacy whose claims

of loyalty rested on presidential pardons (individuals whom the Court had previously declared fit the statutory definition of "loyalist," *see United States v. Padelford,* 76 U.S. (9 Wall.) 531, 19 L.Ed. 788 (1870)). Congress excluded the pardoned southerners by adding a provision instructing the Court of Claims to dismiss their claims for want of jurisdiction. The Court found the amendment unconstitutional because it forbade a federal court from giving "the effect to evidence which, in its own judgment, such evidence should have." *Id.* at 146–48.

For present purposes, the salient aspect of the congressional activity at issue in *Klein* was the attempt to scale back federal courts' jurisdiction to mandate a particular adjudicatory outcome. *Klein* does not prevent Congress from charging the courts to apply standards of conduct to state actors. If *Klein*'s holding were as broad as defendants maintain, hundreds of federal statutes would be constitutionally suspect because, through them, Congress has imposed a statutory standard that the judiciary is charged with upholding. Unlike the statute in *Klein,* the Religious Freedom Restoration Act merely imposes a *standard* of conduct on state actors, not a *rule* of decision on the federal judiciary. The trier of fact may reach any result that the evidence warrants. *See Belgard v. State of Hawaii,* 1995 WL 170221, 1995 U.S.Dist. LEXIS 4903.

■■■ Defendants argue next that "by selecting free exercise claims for inclusion in a legislatively mandated compelling interest analysis, [Congress] itself created an equal protection problem, in that Congress did not choose other arguably equally deserving First Amendment conduct for this heightened scrutiny." If I understand defendants' argument, any attempt by Congress to enforce a limited subset of rights would violate the equal protection clause. Presumably, this would include the Voting Rights Act itself, which dealt with voting discrimination in a piecemeal fashion and was amended and supplemented many times. I reject defendants' argument. The equal protection clause protects against state-sponsored discrimination between persons, not between constitutional rights or provisions of amend-

ments. It would be a mistake to construe the clause as defendants suggest. Congress did not offend the equal protection clause by singling out only one right embodied in the First Amendment for added enforcement protection.

Finally, although defendants have not raised the principle of federalism as a reason for holding the Religious Freedom Restoration Act unconstitutional, the issue lurks in the background. Although Congress's power under § 5 was once considered plenary, the Fourteenth Amendment may not be "applied in complete disregard for a State's constitutional powers." *Gregory v. Ashcroft,* 501 U.S. 452, 468–69, 111 S.Ct. 2395, 2405, 115 L.Ed.2d 410 (1991). However, Congress's power under § 5 is "not limited by the same Tenth Amendment constraints that circumscribe the exercise of its Commerce Clause powers." *EEOC v. Wyoming,* 460 U.S. at 243 n. 18, 103 S.Ct. at 1064 n. 18. The Fourteenth Amendment "necessarily limit[s]" the Eleventh Amendment and principles of federalism, *Fitzpatrick v. Bitzer,* 427 U.S. 445, 96 S.Ct. 2666, 49 L.Ed.2d 614 (1976), because the Civil War Amendments "were specifically designed as an expansion of federal power and an intrusion on state sovereignty." *City of Rome v. United States,* 446 U.S. at 179, 100 S.Ct. at 1562–63.

■■■ I conclude that the Religious Freedom Restoration Act does not violate the principle of federalism embodied in the Tenth and Eleventh Amendments. The primary areas in which principles of federalism may be found to limit Congress's power under § 5 are those within the core of traditional state prerogative, such as voter qualifications in state elections, *see Oregon v. Mitchell,* 400 U.S. at 207–09, 91 S.Ct. at 306–07 (Harlan, J., dissenting), or qualifications for state judges, *Ashcroft,* 501 U.S. at 458–60, 111 S.Ct. at 2400 (setting qualifications for state judges "goes beyond an area traditionally regulated by the States; it is a decision of the most fundamental sort for a sovereign entity.") Although broad in scope, the Religious Freedom Restoration Act does not mandate judicial invasion into any core areas of traditional state prerogative. Even if its application implicated such concerns, howev-

er, states are provided under the act with a complete defense when their actions are narrowly tailored to further a compelling state interest. As the Court made clear in *Ashcroft*, laws enacted under § 5 will be interpreted not to invade core areas of state prerogative unless Congress clearly demonstrates such an intent. *Id.* at 470–71, 111 S.Ct. at 2406. This rule of statutory construction assists in maintaining the proper balance between the federal and state sovereigns, while avoiding the need to declare a congressional enactment unconstitutional. *See id.* Under such a view, core areas of states' rights such as self governance should be viewed as compelling interests under the Religious Freedom Restoration Act. Seen this way, the Religious Freedom Restoration Act places only a reasonable burden on state autonomy and does not transgress the minimal limits federalism places on Congress's § 5 authority.

## E. *Equal Protection*

The equal protection clause of the Fourteenth Amendment guarantees that "all persons similarly situated should be treated alike." *City of Cleburne, Tex. v. Cleburne Living Center,* 473 U.S. 432, 439, 105 S.Ct. 3249, 3253, 87 L.Ed.2d 313 (1985). To prevail on an equal protection claim, a plaintiff must also show that respondents acted with a discriminatory purpose or intent. *Minority Police Officers Ass'n v. South Bend,* 801 F.2d 964, 966 (7th Cir.1986). Unless an equal protection claim involves a suspect class or a fundamental right, courts are to apply the rational basis test. Under this test, a court presumes that the state action is valid and confirms it if it is related rationally to a legitimate state interest. *Pryor v. Brennan,* 914 F.2d 921, 923 (7th Cir.1990).

Defendants offer two reasons to dismiss plaintiffs' equal protection claim, neither of which is persuasive. First, they assert that only rational factors caused them to treat plaintiffs differently from the plaintiffs in *Braun.* According to defendants, "by the time Judge Krueger held the procedures should be promulgated as rules, the defendants had already addressed the plaintiffs'

complaint and complied with the court's decision" and there was no reason to suspend application of the emergency rules against other inmates because no judge had declared them invalid. However, defendants' theory hinges on whether their motivation was rational, a question of fact not properly decided on a motion to dismiss. Second, defendants argue that no other inmate was similarly situated to the *Braun* plaintiffs because the *Braun* plaintiffs were the only inmates litigating the claims. Again, their arguments rest on attempts to clarify the time periods in which the various rules and procedures were in place and to fill in details about whether, for how long and to what degree there was differential treatment. These efforts depend on factual matters outside plaintiffs' complaint that are not properly before the court on a motion to dismiss.

There is another consideration, not raised by defendants, that warrants dismissal of plaintiffs' equal protection claims. In their response to defendants' qualified immunity arguments, discussed below, plaintiffs have announced that they seek only injunctive and declaratory relief. Yet their equal protection claims are premised entirely on allegations of past treatment. It appears from plaintiffs' amended complaint that once the permanent rules went into effect, all inmates were treated equally. "Past exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief ... if unaccompanied by any continuing, present adverse effects." *O'Shea v. Littleton,* 414 U.S. 488, 495–96, 94 S.Ct. 669, 676, 38 L.Ed.2d 674 (1974). Plaintiffs have alleged no continuing, present adverse effects of the differential treatment or "real and immediate threat of repeated injury." In the absence of such allegations, this court is without jurisdiction to entertain the plaintiffs' equal protection class claims and they must be dismissed.

## E. *Qualified Immunity*

The doctrine of qualified immunity protects defendants sued in their individual capacity from liability for monetary damages when the defendant has not violated clearly established law. The Eleventh Amendment

acts as a jurisdictional bar to suits brought against the state either directly or through its agents and immunizes the state from monetary liability for damages. It does not protect state officials from suits requesting only equitable relief, including injunctive and equitable monetary relief. *Kentucky v. Graham,* 473 U.S. 159, 169 n. 18, 105 S.Ct. 3099, 3107 n. 18, 87 L.Ed.2d 114 (1984).

Defendants argue they are protected by the doctrine of qualified immunity from any request for monetary relief because the claims raised by plaintiffs involve unsettled areas of the law. Plaintiffs respond that defendants' fears of traditional money damages are misplaced because plaintiffs seek only declaratory, injunctive and equitable monetary relief. Although I am not confident that plaintiffs' request for equitable monetary relief is viable, *see Edelman v. Jordan,* 415 U.S. 651, 652, 667–69, 94 S.Ct. 1347, 1350, 1351, 1357–58, 39 L.Ed.2d 662 (1973), I will take plaintiffs at their word and construe their amended complaint as containing no request for nonequitable money damages. I will dismiss plaintiffs' claims against defendants in their nonofficial capacities for failure to request any applicable relief. This makes it unnecessary to reach defendants' qualified immunity arguments.

### F. *Sovereign Immunity*

 Under the Eleventh Amendment, an unconsenting state is immune from suit by individual citizens. *Pennhurst State School & Hosp. v. Halderman,* 465 U.S. 89, 100, 104 S.Ct. 900, 907–08, 79 L.Ed.2d 67 (1983). The amendment bars federal law suits that name the state or one of its departments or agencies as the defendant. *Id.; Alabama v. Pugh,* 438 U.S. 781, 98 S.Ct. 3057, 57 L.Ed.2d 1114 (1978). This is true regardless of the type or relief sought by the plaintiff. *Pennhurst,* 465 U.S. at 100, 104 S.Ct. at 907–08 (citing *Missouri v. Fiske,* 290 U.S. 18, 27, 54 S.Ct. 18, 21, 78 L.Ed. 145 (1933)). Because this court lacks jurisdiction over claims brought directly against the State of Wisconsin and because the Wisconsin Department of Corrections is a state entity, this defendant will be dismissed on the court's own motion.

### ORDER

IT IS ORDERED that defendants' motion to dismiss is GRANTED with respect to plaintiffs' claim that the challenged regulations deprive them of their right of access to the courts, and plaintiffs' claims that they were denied equal protection. In all other respects, defendants' motion to dismiss is DENIED. On the court's own motion, defendant Department of Corrections is dismissed from the law suit on the ground of Eleventh Amendment immunity. A status conference will be held on July 19, 1995, at 8:30 a.m., to discuss further scheduling in this case. The trial date of July 17, 1995 is continued indefinitely.