Cardinal William H. KEELER, et al., Plaintiffs,

v.

MAYOR & CITY COUNCIL OF CUMBERLAND, et al., Defendants.

No. S96–167.

United States District Court, D. Maryland, Northern Division.

June 10, 1996.

Peter E. Keith, Thomas N. Biddison, Jr., David W. Kinkopf, Baltimore, MD, for plaintiffs.

H. Jack Price, Jr., City Solicitor, Cumberland, MD, for defendants.

Lynne A. Battaglia, United States Attorney, Kay A. Allison, Assistant United States Attorney, Baltimore, MD, for Intervenor—United States of America.

## MEMORANDUM OPINION AND ORDER

SMALKIN, District Judge.

This action is before the Court on the motion of the defendant Mayor and City

Council of Cumberland to dismiss the complaint for failure to state a claim upon which relief can be granted. The plaintiffs, Cardinal William H. Keeler, Roman Catholic Archbishop of Baltimore (representing the archdiocese as a corporation sole) and St. Peter and Paul's Roman Catholic Congregation, Inc., have opposed the motion. The United States has intervened under 28 U.S.C. § 2403(a) for the purpose of defending the constitutionality of the Religious Freedom Restoration Act, 42 U.S.C. § 2000bb. No oral argument is necessary. Local Rule 105.6, D. Md.

### Factual Background

St. Peter and Paul's Roman Catholic Church occupies an entire block of the city of Cumberland, Maryland. The block contains a church, a "massive" monastery with a large chapel, and a corridor known as the "White Elephant," which connects the monastery to the sacristy of the Church. (Cmplt. ¶ 10). The buildings were built between 1848 and 1889.

In 1974, the City of Cumberland enacted a Historic Zoning Ordinance and established a Historic Preservation Commission. Four years later, the City created the Washington Street Historic District, which includes all of the ecclesiastical buildings of St. Peter and Paul's church. Once the church had become part of the historic district, the church buildings could only be altered or demolished with the approval of the Cumberland Historic Preservation Commission.

The monastery and chapel have stood empty since 1986. The large buildings are in disrepair. According to the complaint, the "estimated cost for reconstruction simply to retain and adequately maintain the structure exceeds three hundred and eighty thousand dollars ... plus significant annual maintenance costs," and "[t]he estimated cost for a complete renovation of the entire building exceeds two million dollars." (Cmplt. ¶¶ 13 and 14).

After several plans to preserve or convert the building failed, the parish decided that "the Monastery and Chapel should be razed in order to remove a draining financial liability and that a badly needed Church Annex and other facilities should be built on the property for the good of the parish." (Cmplt. ¶ 1). On August 14, 1995, the plaintiffs applied to the Cumberland Historic Preservation Commission for a Certificate of Appropriateness to demolish the monastery and chapel building. The Commission held a public hearing to consider the application on September 11, 1995. The Commission subsequently denied the demolition application. According to the plaintiffs, the effect of the Commission's decision is to force "SS Peter and Paul Church and its parishioners to maintain an enormous building which has no function for the parish, is a significant financial liability and whose presence prevents the parish from meeting the religious needs of its congregation." (Cmplt. at ¶ 2).

### The Complaint

On January 18, 1996, the plaintiffs filed a ten-count complaint in this Court. Count I alleges that the City of Cumberland's application of its Historic Preservation Ordinance to the plaintiffs violates the Religious Freedom Restoration Act of 1993, 42 U.S.C. § 2000bb (RFRA), because it substantially burdens the free exercise of religion. Counts II and III allege that the City of Cumberland has violated both the Free Exercise Clause of the First Amendment to the United States Constitution and the corresponding provision of the Maryland Constitution, Article 36 of the Declaration of Rights. Count IV alleges a violation of the Establishment Clause. Count V alleges that the actions of the Historic District Commission "restrict[ ] freedom of expression and speech" and infringe upon parishioners' right to assemble. Counts VI and VII seek relief under the Fifth Amendment to the United States Constitution and Articles 19 and 24 of the Maryland Declaration of Rights, contending that the City has effected an unconstitutional taking of the plaintiffs' property. Counts VIII and IX allege that the actions of the Historic Preservation Commission violated the Due Process Clause of the Fourteenth Amendment and Article 24 of the Maryland Declaration of Rights because they were "arbitrary and capricious, were not supported by substantial evidence, and violated state and local law." Lastly, in Count X, the plaintiffs seek a

declaratory judgment that the City of Cumberland may not apply its Historic Zoning Ordinance to the plaintiffs. In addition, the plaintiffs seek an order directing the City to permit the demolition of the monastery, the chapel and the "White Elephant," an award of attorneys' fees under 42 U.S.C. § 1988, and damages "in an amount to be determined" during the litigation.

## The Motion to Dismiss

On February 26, 1996, the defendants filed a motion to dismiss the complaint. According to the defendants, the complaint fails to state a claim upon which relief can be granted and is "barred by the doctrine of waiver." (Mot. to Dismiss at 1). The defendants attached to their motion the transcript of the hearing before the Historic District Commission on September 11, 1995. The plaintiffs filed an opposition to the motion on March 11, 1996. The plaintiffs' opposition was also supported by exhibits.

Although the defendants do not specifically so state, their motion to dismiss for failure to state a cause of action is authorized by Rule 12(b)(6) of the Federal Rules of Civil Procedure. A Rule 12(b)(6) motion must be denied "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–02, 2 L.Ed.2d 80 (1957) (footnote omitted); *accord Mylan Laboratories, Inc. v. Matkari*, 7 F.3d 1130, 1134 (4th Cir.1993), *cert. denied* 510 U.S. 1197, 114 S.Ct. 1307, 127 L.Ed.2d 658 (1994). A Rule 12(b)(6) motion, therefore, tests the legal sufficiency of the plaintiff's complaint, and, if the complaint is legally insufficient, "authorizes a court to dismiss a claim on the basis of a dispositive issue of law[.]" *Neitzke v. Williams*, 490 U.S. 319, 326, 109 S.Ct. 1827, 1832, 104 L.Ed.2d 338 (1989).

Rule 12 provides, in part, as follows:

"If, on a motion . . . to dismiss for failure of the pleading to state a claim upon which relief can be granted, matters outside the pleading are presented to and not excluded by the court, the motion shall be treated as one for summary judgment . . ."

In the present case, both parties presented exhibits to this Court in addition to the pleadings. If this Court were to consider those exhibits, then the defendants' motion to dismiss would be converted to a Rule 56 motion for summary judgment. *See, e.g., Wilson–Cook Medical, Inc. v. Wilson*, 942 F.2d 247, 251–252 (4th Cir.1991); *Gay v. Wall*, 761 F.2d 175, 177 (4th Cir.1985). Unlike a 12(b)(6) motion, a motion for summary judgment is an adjudication of the merits of the plaintiff's case, based upon undisputed facts.

Under the circumstances of the present case, this Court will exercise its discretion to exclude the matter extraneous to the pleadings and to treat the motion as a 12(b)(6) motion, as the parties apparently intended. In light of the numerous legal theories advanced by the plaintiffs and the relatively undeveloped state of the record, the parties should be given an opportunity to file properly-supported motions for summary judgment at a later stage of the litigation.

## Analysis

The defendants argue that the complaint fails to state a cause of action under any legal theory advanced by the plaintiffs. This Court may dismiss the complaint only if it appears, as a matter of law, that no set of facts the plaintiffs might prove would entitle them to relief under any legal theory. *See Conley v. Gibson*, 355 U.S. at 45–46, 78 S.Ct. at 101–02. Accordingly, "[t]he court, in deciding a 12(b)(6) motion, must take all wellpleaded material allegations of the complaint as admitted and view them in the light most favorable to the plaintiff." *De Sole v. U.S.*, 947 F.2d 1169, 1171 (4th Cir.1991).

The defendants first argue that the plaintiffs waived their right to sue the defendants by entering into a "Stipulation and Agreement" with the City. The complaint cannot be dismissed on the basis of the affirmative defense of waiver, however, when the issue is the legal sufficiency of the plaintiffs' complaint. The defendants also contend that the Mayor and City Council of Cumberland should be dismissed as party defendants because "the City has had no involvement in this matter." (Dfts.' Mot. to Dismiss at 11).

The plaintiffs, however, contend that the Historic District Ordinances passed by the City Council violate their rights guaranteed by the First and Fifth Amendments to the United States Constitution. The complaint alleges that the defendants "acted under state law, pursuant to their official policies and customs, and in their official capacities as entities of local government in the City of Cumberland." (Cmplt. ¶ 27.) To the extent that the plaintiffs may have stated a constitutional cause of action cognizable under 42 U.S.C. § 1983, they have also adequately alleged the basis for § 1983 municipal liability. *See Monell v. Dep't of Social Services,* 436 U.S. 658, 694, 98 S.Ct. 2018, 2037–38, 56 L.Ed.2d 611 (1978); *Pembaur v. City of Cincinnati,* 475 U.S. 469, 480, 106 S.Ct. 1292, 1298–99, 89 L.Ed.2d 452 (1986).

Turning to the substance of the plaintiffs' causes of action, the defendants contend that the plaintiffs have failed to state a claim under any provision of the federal or state constitutions. The plaintiffs claim relief under the free exercise and establishment clauses of the First Amendment, as applied to the states through the Fourteenth Amendment, under Article 36 of the Maryland Declaration of Rights, and under the federal and state due process clauses. The Court's present obligation is to determine the legal sufficiency of the complaint, rather than to make any determination with respect to its merits. The plaintiffs' complaint properly alleges in Counts II through IX every element of each constitutional claim, and the factual allegations in support of those claims are legally sufficient. The defendants' motion to dismiss these counts will, therefore, be *denied.*

Count X seeks a declaratory judgment based upon the constitutional violations alleged in Counts I through IX. Consequently, the defendants' motion to dismiss Count X will also be *denied.*

■ With respect to the plaintiffs' statutory claim, the defendants contend that RFRA, the statute that forms the basis of the cause of action alleged in Count I, is unconstitutional. This purely legal argument is appropriate for disposition on a motion to dismiss. If RFRA itself is invalid, then no set of facts alleged by the plaintiffs could entitle them to relief under that statute.

### RFRA

RFRA provides, *inter alia,* that:

Government may substantially burden a person's exercise of religion only if it demonstrates that application of the burden to the person—

(1) is in furtherance of a compelling government interest; and

(2) is the least restrictive means of furthering that compelling governmental interest.

42 U.S.C. § 2000bb–1(b). The plaintiffs in the present case contend that the City's application of its Historic Zoning Ordinance substantially burdens their exercise of religion, and that the ordinance neither furthers a compelling government interest nor constitutes the least restrictive means of furthering possible interests of the government in historic preservation.

The defendants argue that the plaintiffs' statutory claim must fail because RFRA is unconstitutional. According to the defendants, in enacting RFRA Congress "has sought to step into the shoes of the judiciary to create a test for constitutional interpretation." (Dfts.' Memo. of Law at 15). The plaintiffs and the United States respond that RFRA is a valid exercise of Congress's power under § 5 of the Fourteenth Amendment to legislate enforcement of the Amendment.[1] Consequently, the parties have raised, and this Court must address, interlinked challenges to the constitutionality of RFRA based both upon the separation of powers and upon the limits of Congressional authority under § 5 of the Fourteenth Amendment.

■ The acts of Congress are presumed to be constitutional. *United States v. Na-*

---

1. RFRA was intended to protect rights relating to the free exercise of religion. 42 U.S.C. § 2000bb(a)(1) & (b). The First Amendment to the United States Constitution, which provides the federal constitutional right of free exercise, is applicable to the states through the Fourteenth Amendment. *See, e.g., Cantwell v. Connecticut,* 310 U.S. 296, 303, 60 S.Ct. 900, 903, 84 L.Ed. 1213 (1940).

*tional Dairy Products Corp.,* 372 U.S. 29, 32, 83 S.Ct. 594, 597–98, 9 L.Ed.2d 561 (1963). Indeed, "the power to declare a legislative enactment void is one which the judge, conscious of the fallibility of the human judgment, will shrink from exercising in any case where he can conscientiously and with due regard to duty and official oath decline the responsibility." Thomas M. Cooley, *Treatise on Constitutional Limitations,* 159 (Little, Brown 1868). Nevertheless, courts may not "close their eyes on the constitution, and see only the law." *Marbury v. Madison,* 1 Cranch. 137, 178, 2 L.Ed. 60 (1803). If Congress lacked the power to enact RFRA, then this Court cannot shirk its obligation to say so, and to refuse to enforce the statute.

According to the plaintiffs and the United States, this case is squarely controlled by a series of cases describing Congress's broad authority under § 5 of the Fourteenth Amendment "to enforce, by appropriate legislation, the provisions of this Article." U.S. Const.Amend. XIV, § 5. The parties assert no other ground of Congressional authority to enact the statute.[2] Legislation enacted under § 5 is constitutional if the statute "may be regarded as an enactment to enforce [the Fourteenth Amendment]," if it is " 'plainly adapted to that end,' " and if "it is not prohibited by but is consistent with 'the letter and spirit of the constitution.' " *Katzenbach v. Morgan,* 384 U.S. 641, 651, 86 S.Ct. 1717, 1723–24, 16 L.Ed.2d 828 (1966) (quoting *M'Culloch v. Maryland,* 4 Wheat. 316, 421, 4 L.Ed. 579 (1819)). *See also Ex Parte Virginia,* 100 U.S. 339, 25 L.Ed. 676 (1879); *Oregon v. Mitchell,* 400 U.S. 112, 91 S.Ct. 260, 27 L.Ed.2d 272 (1970); *Fitzpatrick v. Bitzer,* 427 U.S. 445, 96 S.Ct. 2666, 49 L.Ed.2d 614 (1976); *City of Rome v. United States,* 446

U.S. 156, 100 S.Ct. 1548, 64 L.Ed.2d 119 (1980); *City of Richmond v. J.A. Croson Co.,* 488 U.S. 469, 490, 109 S.Ct. 706, 720, 102 L.Ed.2d 854 (1988). *But see Adarand Constructors, Inc. v. Pena,* —— U.S. ——, ——, 115 S.Ct. 2097, 2114, 132 L.Ed.2d 158 (1995). Because of the constitutional basis for the Supreme Court's decision in *Employment Division v. Smith,* 494 U.S. 872, 110 S.Ct. 1595, 108 L.Ed.2d 876 (1990) (*"Smith II"*), however, reliance on these cases to support the constitutionality of RFRA is misplaced.

### The Decision in Employment Division v. Smith

In *Smith II,* the Supreme Court held that the right of free exercise protected by the First Amendment "does not relieve an individual of the obligation to comply with a 'valid and neutral law of general applicability on the ground that the law proscribes (or prescribes) conduct that his religion prescribes (or proscribes).' " *Smith II,* 494 U.S. at 879, 110 S.Ct. at 1600 (quoting Justice Stevens' concurring opinion in *United States v. Lee,* 455 U.S. 252, 263 n. 3, 102 S.Ct. 1051, 1058–59, 71 L.Ed.2d 127 (1982)). Rather, states have the right to enact and enforce generally applicable rules of conduct even when those rules conflict with the religious practices of certain individuals.[3]

The Court in *Smith II* considered and rejected the argument that free exercise challenges to generally applicable laws should be measured under the compelling interest test:

> We conclude today that the sounder approach, and the approach in accord with the vast majority of our precedents, is to hold the test inapplicable to such challenges. The government's ability to enforce generally applicable prohibitions of

---

**2.** The United States, the plaintiffs, and apparently Congress itself, rely exclusively on § 5 as the basis for Congressional authority in this case. *See* United States' Memorandum at 3 (citing House and Senate Reports); Plaintiffs' Opposition at 20. Consequently, the issue of Congress's power under the Commerce Clause to affect the legislative powers of the States is not implicated in the present action. *See generally New York v. United States,* 505 U.S. 144, 112 S.Ct. 2408, 120 L.Ed.2d 120 (1992), and cases cited therein. *But see United States v. Lopez,* —— U.S. ——, 115

S.Ct. 1624, 1630, 131 L.Ed.2d 626 (1995) (holding that Congress may only act under the Commerce Clause to regulate those activities which "substantially affect" interstate commerce).

**3.** Where state regulation is alleged to violate both the Free Exercise Clause and some other constitutionally protected right, then the application of a neutral statute may be constitutionally prohibited. *See Smith II,* 494 U.S. at 881–882, 110 S.Ct. at 1601–02, and cases there cited.

socially harmful conduct, like its ability to carry out other aspects of public policy, "cannot depend on measuring the effects of a governmental action on a religious objector's spiritual development." [*Lyng v. Northwest Indian Cemetery Protective Ass'n*, 485 U.S. 439, 451, 108 S.Ct. 1319, 1326–27, 99 L.Ed.2d 534 (1988).] To make an individual's obligation to obey such a law contingent upon the law's coincidence with his religious beliefs, except where the State's interest is "compelling"—permitting him, by virtue of his beliefs, "to become a law unto himself," [*Reynolds v. United States*, 98 U.S. 145, 167, 25 L.Ed. 244 (1879) ]—contradicts both constitutional tradition and common sense.

*Smith II*, 494 U.S. at 885, 110 S.Ct. at 1603–04. Applying the compelling interest test in free exercise cases would, in the Court's view, create "a private right to ignore generally applicable laws— ... a constitutional anomaly." 494 U.S. at 886, 110 S.Ct. at 1604.

The Court emphasized that the free exercise clause has traditionally been understood to require only limited scrutiny of generally applicable legislation, and observed that it had "never held that an individual's religious beliefs excuse him from compliance with an otherwise valid law prohibiting conduct that the state is free to regulate." *Smith II*, 494 U.S. at 878–879, 110 S.Ct. at 1599, 1600.[4] To grant strict scrutiny protection to free exercise rights would, in the Court's view, im-

properly curtail the legislative authority of the states: "The government's ability to enforce generally applicable prohibitions of harmful conduct, like its ability to carry out other aspects of public policy, 'cannot depend on measuring the effects of a governmental action on a religious objector's spiritual development.'" 494 U.S. at 885, 110 S.Ct. at 1603–04 (quoting *Lyng v. Northwest Indian Cemetery Protective Ass'n*, 485 U.S. 439, 451, 108 S.Ct. 1319, 1326–27, 99 L.Ed.2d 534 (1988)).[5]

The Supreme Court in *Smith II* also pointed out that the use of the compelling interest test would necessarily force the courts to make improper inquiries into the relative importance of religious beliefs or practices. The Court stated emphatically that "[r]epeatedly and in many different contexts, we have warned that courts must not presume to determine the place of a particular belief in a religion or the plausibility of a religious claim." 494 U.S. at 887, 110 S.Ct. at 1604–05. Nonetheless, if no inquiry into the relative importance of religious practices were undertaken in considering free exercise claims, strict scrutiny "would require ... the same degree of 'compelling state interest' to impede the practice of throwing rice at weddings as to impede the practice of getting married in church." 494 U.S. at 888 n. 4, 110 S.Ct. at 1605 n. 4. Consequently, according the Court, although judicial assessment of

---

**4.** The Court quoted its observation in *Minersville School Dist. v. Gobitis*, 310 U.S. 586, 594–595, 60 S.Ct. 1010, 1012–13, 84 L.Ed. 1375 (1940) (Frankfurter, J.), that " '[c]onscientious scruples have not, in the course of the long struggle for religious toleration, relieved the individual from a general law not aimed at the promotion or restriction of religious beliefs,' " 494 U.S. at 897, 110 S.Ct. at 1609–1610, and the earlier statement in *Reynolds v. United States*, 98 U.S. 145, 166–167, 25 L.Ed. 244 (1879), that for " 'a man [to] excuse his practices [contrary to law] because of his religious belief ... would be to make the professed doctrines of religious belief superior to the law of the land, and in effect to permit every citizen to become a law unto himself.' " *Ibid.*

**5.** According to the Supreme Court, not only is the compelling interest test not constitutionally required by the First Amendment, but it under-

mines the very values protected by that provision:

> If the "compelling interest" test is to be applied at all ... it must be applied across the board, to all actions thought to be religiously commanded. Moreover, if "compelling interest" really means what it says (and watering it down here would subvert its rigor in other fields where it is applied), many laws will not meet the test. Any society adopting such a system would be courting anarchy, but that danger increases in direct proportion to the society's diversity of religious beliefs, and its determination to coerce or suppress them.... [P]recisely because we value and protect ... religious divergence, we cannot afford the luxury of deeming *presumptively invalid*, as applied to the religious objector, every regulation of conduct that does not protect an interest of the highest order.

*Smith II*, 494 U.S. at 888, 110 S.Ct. at 1605 (emphasis in the original).

religious matters is improper, "dispensing with a 'centrality' requirement is utterly unworkable." *Ibid.*

*Smith II*, therefore, holds that the free exercise clause, standing alone, does not provide a basis for subjecting state regulations of general applicability to review under the compelling interest test. On the contrary, the use of such a standard is, in the judgment of the Supreme Court, antithetical to the American constitutional tradition and to the proper role of the judiciary.

### The Scope of RFRA

At the heart of the present dispute lies the parties' disagreement about the nature and consequences of RFRA. According to the defendants, the statute violates the separation of powers because it imposes a rule of constitutional interpretation upon the courts. The plaintiffs and the United States take the position that RFRA "simply provides prophylactic statutory protection for the Fourteenth Amendment's free exercise guarantee, as substantively interpreted by the judiciary." (Memo. of United States at 18).

There are two versions of the plaintiffs'. argument that RFRA is constitutional because it creates a statutory protection, rather than a rule of judicial interpretation. First, the United States and the plaintiffs appear to argue that simply because RFRA is a statute which prohibits certain government action, it does not impose a standard of review upon the courts. According to the plaintiffs, RFRA imposes a standard of conduct, rather than a rule of judicial decision. Support for this position is provided by citations to RFRA's legislative history. The plaintiffs, for example, quote the following passage from the Senate Judiciary Committee's report on the Act:

"While the act is intended to enforce the right guaranteed by the free exercise clause of the first amendment, it does not purport to legislate the standard of review to be applied by the Federal Courts in cases brought under that constitutional provision. Instead, *it creates a new statutory prohibition.*"

(Pltfs.' Memo. at ·19 (quoting 1993 U.S.C.C.A.N. at 1904 n. 43) (emphasis added by the plaintiffs)).

RFRA itself, though, is more candid than its legislative history, providing, in part, as follows:

The Congress finds that—

(1) the framers of the Constitution, recognizing free exercise of religion as an unalienable right, secured its protection in the First Amendment to the Constitution; . . .

(4) in *Employment Division v. Smith,* 494 U.S. 872 (1990) the Supreme Court virtually eliminated the requirement that the government justify burdens on religious exercise imposed by laws neutral toward religion; and

(5) the compelling interest test as set forth in prior Federal court rulings is a workable test for striking sensible balances between religious liberty and competing prior governmental interests.

**(b) Purposes**

The purposes of this chapter are—

(1) to restore the compelling interest test as set forth in *Sherbert v. Verner,* 374 U.S. 398, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963) and *Wisconsin v. Yoder,* 406 U.S. 205, 92 S.Ct. 1526; 32 L.Ed.2d 15 (1972) and to guarantee its application in all cases where free exercise of religion is substantially burdened; . . .

42 U.S.C. § 2000bb. The statute defines "exercise of religion" as "the exercise of religion under the First Amendment to the Constitution." 42 U.S.C. § 2000bb–2(4).

▬▬ RFRA itself forthrightly declares that its purpose is to restore the compelling interest test as the rule of decision in cases implicating the First Amendment. Regardless of pronouncements to the contrary in the legislative history, "[t]he [assertion] that Congress has created a statutory right is facile and ultimately incomplete" as an answer to whether the. statute imposes a standard of judicial review. *P.F. Flores v. City of Boerne, Texas,* 73 F.3d 1352, 1361 (5th Cir.1996).[6] The stated purpose of the statute

---

**6.** If the language of a statute is clear and unambiguous, then the statute's legislative history is

is to require courts to decide free exercise cases under the compelling interest standard, and it has achieved the desired effect. *See, e.g., Hamilton v. Schriro*, 74 F.3d 1545, 1551–1552 (8th Cir.1996); *Werner v. McCotter*, 49 F.3d 1476, 1479 (10th Cir.), *cert. denied* — U.S. ——, 115 S.Ct. 2625, 132 L.Ed.2d 866 (1995); *May v. Baldwin*, 895 F.Supp. 1398, 1403 (D.Or.1995) ("prisoners' free exercise of religion claims are to be analyzed under the Religious Freedom Restoration Act").

Consequently, it puts the cart far ahead of the horse to suggest that "the Religious Freedom Restoration Act merely imposes a *standard* of conduct on state actors, not a *rule* of decision on the federal judiciary," *Sasnett v. Department of Corrections*, 891 F.Supp. 1305, 1320 (W.D.Wis.1995) *appeal docketed* (7th Cir) (emphasis in the original).[7] *See also EEOC v. Catholic University of America*, 83 F.3d 455, 1996 LEXIS 11205, *14 (D.C.Cir., May 14, 1996). Indeed, the supposedly significant distinction between standards of conduct and rules of decision is illusory where the "standard of conduct" consists of nothing more than compliance with the judicially-administered compelling interest test. One reads these cases with some degree of amazement, in the vain hope of finding that the Emperor's new clothes do not dazzle everyone's eyes.

The United States and the plaintiffs also advance the related and more sophisticated argument that even if RFRA does impose a rule of judicial decision, it does not require that First Amendment free exercise claims be decided under the compelling interest test, but merely provides a statutory right which involves the use of that standard.

Again, the United States relies upon legislative history to support its position, quoting the House Report's comments concerning the name of the Religious Freedom Restoration Act:

> "Of course, the label 'restoration' in this context is inappropriate. Congress writes laws—it does not and cannot overrule the Constitution and thus is unable to 'restore' a prior interpretation of the First Amendment."

(Memo. of United States at 19 (quoting H.R.Rep. No. 88 at 14 n. 3).

RFRA prohibits government from "substantially burdening" a person's "exercise of religion" without a compelling interest where "'exercise of religion' means the exercise of religion under the First Amendment to the Constitution." 42 U.S.C. § 2000bb–2(4). The plain language of the statute, therefore, can theoretically be viewed either as making the compelling interest directly applicable to First Amendment free exercise cases or as imposing a statutory bar to more intrusive government regulation of the exercise of religion.

The argument that RFRA does not impose the compelling interest test upon the First Amendment itself, but, rather, "does nothing more than statutorily augment the protection afforded religious conduct, which is protected by the Free Exercise Clause" is sophistry. (Memo. of United States at 19–20). Again, the flaw in the argument arises from the fact that RFRA does not, in fact, contain any independent statutory prohibition of government conduct—it merely directs the courts to apply a particular standard of judicial review in cases involving "the exercise of religion

---

ordinarily not pertinent to the court's interpretation of the statute. *See, Norfolk & Western Railway Co. v. American Train Dispatchers' Ass'n*, 499 U.S. 117, 128, 111 S.Ct. 1156, 1163, 113 L.Ed.2d 95 (1991); *In re JKJ Chevrolet Inc.*, 26 F.3d 481, 483 (4th Cir.1994); *Doski v. M. Goldseker Co.*, 539 F.2d 1326 (4th Cir.1976).

Canvassing the legislative history is particularly inapposite in the present case. The possibility that Congress might lack the power to pass RFRA was considered during the legislative process. Beyond doubt, our legislators are aware that courts frequently consider legislative history in resolving challenges to statutes. Under such circumstances, the Senate Judiciary Committee's

statement that RFRA "does not purport to legislate the standard of review to be applied by the Federal courts," 1993 U.S.C.C.A.N.1904 n. 3, casts no *real* doubt on Congress's real intention "to restore the compelling interest test ... and to guarantee its application in all cases where free exercise of religion is substantially burdened," 42 U.S.C. § 2000bb(b)(1).

7. The *Sasnett* court's comment was made in a slightly different context. It very aptly points up, however, the distinction at issue here between statutory rules of conduct and judicial rules of decision.

under the First Amendment to the Constitution." 42 U.S.C. § 2000bb–2(4). Because the trigger for invoking RFRA is a claim under the First Amendment, and because RFRA provides that the courts must decide First Amendment cases under the compelling interest test, the distinction between applying the compelling interest test as part of the Amendment and applying it as a matter of statutory law is functionally meaningless.[8]

■ Even if RFRA did apply the compelling interest standard to some statutory right, rather than to the First Amendment itself, the practical effect of the statute would nevertheless be to remove the free exercise clause of the First Amendment from consideration by the courts. The established practice of the federal courts is "to resolve statutory questions at the outset where to do so might obviate the need to consider a constitutional issue." *United States v. Wells Fargo Bank,* 485 U.S. 351, 354, 108 S.Ct. 1179, 1181–82, 99 L.Ed.2d 368 (1988). *See also Lyng v. Northwest Indian Cemetery Protective Ass'n,* 485 U.S. 439, 445–446, 108 S.Ct. 1319, 1323–24, 99 L.Ed.2d 534 (1988), and cases there cited (observing that a constitutional decision is inappropriate if a case can be decided on statutory grounds). By its own terms, RFRA provides a statutory basis for decision in any case involving the exercise of religious freedom. Moreover, because RFRA tests Government action under a compelling interest standard, RFRA deprives the courts of the opportunity to evaluate such action under the First Amendment itself. Certainly, if government action survives strict scrutiny, it will pass muster under the standards enunciated in *Smith II.* Conversely, if government action impermissibly intrudes upon free exercise under the compelling interest test set forth in RFRA, then RFRA will be dispositive of the free exercise

claim, and it will be unnecessary to reach issues relating to the First Amendment. *See, e.g., Hamilton v. Schriro,* 74 F.3d 1545, 1551–1552 (8th Cir.1996); *Werner v. McCotter,* 49 F.3d 1476, 1479 (1995); *May v. Baldwin,* 895 F.Supp. 1398 (D.Or.1995).

■ Thus, despite the *prima facie* plausibility of the Siren notion that RFRA does not interpret the First Amendment but merely protects free exercise rights by statute, the argument has no substance. The constitutional structure of government is a practical reality, not a theoretical exercise. The intent and effect of RFRA is to require courts to decide all First Amendment free exercise cases under the compelling interest test, even where litigants challenge generally applicable regulations. In every meaningful way, RFRA legislates the standard of judicial review for cases decided under the Free Exercise Clause of the First Amendment.

### The Power of Congress Under § 5

■ As the plaintiffs and the United States point out, the Supreme Court has broadly construed the Congressional grant of authority under § 5 of the Fourteenth Amendment.[9] Specifically, Congress may undoubtedly enact legislation under § 5 to prohibit state action which does not itself violate the constitution. *Morgan,* 384 U.S. at 650, 86 S.Ct. at 1723; *City of Rome,* 446 U.S. at 175–178, 100 S.Ct. at 1560–62. Moreover, when Congress so acts, "it is exercising ... authority under one section of a constitutional Amendment whose other sections by their own terms embody limitations on state authority," and Congress can therefore limit the powers of the states. *Fitzpatrick v. Bitzer,* 427 U.S. 445, 456, 96 S.Ct. 2666, 2671, 49 L.Ed.2d 614 (1976). *See also Ex Parte Virginia,* 100 U.S. 339, 25 L.Ed. 676 (1880).

---

**8.** Conceivably, an argument could be made that RFRA does not apply the compelling interest standard to First Amendment free exercise rights because RFRA only comes into play when free exercise rights are *substantially* burdened. *See* 42 U.S.C. § 2000bb–1. The Supreme Court's discussion in *Smith II* of the impropriety of judicial inquiries into centrality to a person's religion of particular beliefs or practices, however, seriously undermines such a position. *Smith II,* 494 U.S. at 886–888, 110 S.Ct. at 1604–05.

**9.** RFRA purports to apply to governmental action by both the state and federal governments. 42 U.S.C. § 2000bb–2(1). Because the Fourteenth Amendment, and consequently Congress's power to enforce it, only authorizes federal limitations upon the *states,* however, the basis for Congress's attempts to regulate federal activity under § 5 of the Fourteenth Amendment is unclear.

Nevertheless, the powers granted to Congress under § 5 are not limitless. As *Morgan* explains, legislation enacted under § 5 must be both "adapted to carry out the objects the amendments have in view," 384 U.S. at 650, 86 S.Ct. at 1723 (quoting *Ex Parte Virginia,* 100 U.S. at 345, 25 L.Ed. 676), and consistent with the remainder of the Constitution. 384 U.S. at 656, 86 S.Ct. at 1726–27. In the present case, the second criterion cannot be satisfied.

A valid exercise of the power under § 5 must provide remedies "which are not prohibited by, but are consistent 'with the letter and spirit of the constitution.'" *Morgan,* 384 U.S. at 656, 86 S.Ct. at 1726–27 (quoting *McCulloch v. Maryland,* 4 Wheat. at 421, 4 L.Ed. 579). RFRA violates the constitutional separation of powers by requiring the courts to employ a standard of judicial review for First Amendment cases which has been expressly rejected by the Supreme Court.

■ Congress may not "[exceed] its authority by requiring the federal courts to exercise 'the judicial Power of the United States,' U.S. Const., Art. III, § 1, in a manner repugnant to the text, structure and traditions of Article III." *Plaut v. Spendthrift Farm, Inc.,* — U.S. ——, 115 S.Ct. 1447, 1452, 131 L.Ed.2d 328 (1995). The tradition of committing the construction of the constitution exclusively to the courts, rather than to Congress, can be traced back to the Federalists' arguments for ratification of the federal Constitution:

The interpretation of the laws is the proper and peculiar province of the courts. A constitution is in fact, and must be regarded by the judges as a fundamental law. It therefore belongs to them to ascertain its meaning as well as the meaning of any particular act proceeding from the legislative body. If there should happen to be an irreconcilable variance between the two, that which has the superior obligation and validity ought of course to be preferred; or in other words, the constitution ought to be

preferred to the statute, the intention of the people to the intention of their agents.

Federalist No. 78, at 467 (Alexander Hamilton) (Clinton Rossiter ed., 1961).[10] Later, the Supreme Court itself described its constitutional power, in the famous statement in *Marbury v. Madison,* 5 U.S. (1 Cranch.) at 137, 2 L.Ed. 60 (1803), that

[i]t is emphatically the province and duty of the judicial department to say what the law is. Those who apply the rule to particular cases, must of necessity expound and interpret that rule.

5 U.S. (1 Cranch.) at 177, 2 L.Ed. 60. A century and a half later, the Court reaffirmed that

Deciding whether a matter has in any measure been committed by the Constitution to another branch of government, or whether the action of that branch exceeds whatever authority has been committed, is itself a delicate exercise in constitutional interpretation, and is a responsibility of this Court as ultimate interpreter of the Constitution.

*Baker v. Carr,* 369 U.S. 186, 211, 82 S.Ct. 691, 706–07, 7 L.Ed.2d 663 (1962). More recently, holding that the Commerce Clause authorizes legislation only over activities which have a substantial effect on interstate commerce, the Court responded as follows to the criticism that legal uncertainty would result from such judicially-imposed limitations upon Congress's exercise of its legislative power: "Congress has operated within this framework of legal uncertainty ever since this Court determined that it was the judiciary's duty 'to say what the law is.'" *United States v. Lopez,* — U.S. ——, ——, 115 S.Ct. 1624, 1633, 131 L.Ed.2d 626 (1995) (quoting *Marbury v. Madison,* 1 Cranch. at 177).

The rule of decision imposed by RFRA is judicial, rather than legislative. RFRA invalidates that portion of the *Smith II* opinion in which the Court exercises its exclusively judicial power to say what the constitution means. By rejecting the compelling interest

---

10. The Federalists perceived a real danger of legislative usurpation of judicial and executive power: "The legislative department is everywhere extending the sphere of its activity, and

drawing all power into its impetuous vortex." The Federalist No. 48, at 309 (James Madison) (Clinton Rossiter ed., 1961).

test for First Amendment free exercise cases, the Court delineated the limits of a federal constitutional restriction upon the legislative power of the states. The Court marked out the boundary of the free exercise component of the First Amendment by specifying the standard of judicial review for challenges to state action based on that right. By mandating the compelling interest standard rejected by the Supreme Court, RFRA improperly renders ineffective that portion of the *Smith II* opinion which interprets the scope and effect of the First Amendment.[11]

In the area of individual rights, it is precisely by determining the appropriate standard of judicial review of government action that the Supreme Court ordinarily strikes the balance between the authority of the state and the individual's right to protection from unconstitutional government conduct. For example, in *Adarand Constructors, Inc. v. Pena*, —— U.S. ——, 115 S.Ct. 2097, 132 L.Ed.2d 158 (1995), holding that racial classifications enacted by Congress are subject to strict scrutiny, the Court described the constitutional basis for its decision as follows:

> [T]he Fifth and Fourteenth Amendments to the Constitution protect *persons*, not *groups*. It follows from that principle that all governmental action based on race ... should be subjected to detailed judicial inquiry to ensure that the *personal* right to equal protection of the laws has not been infringed. These ideas have been central to this Court's understanding of equal protection, and holding "benign" state and federal classifications to different standards does not square with them.

*Adarand*, —— U.S. —— at ——————, 115 S.Ct. at 2112–2113.[12] *See also United States v. Carolene Products Co.*, 304 U.S. 144, 152–153 n. 4, 58 S.Ct. 778, 783–84 n. 4, 82 L.Ed. 1234 (1938). *Compare Lopez*, —— U.S. at ——, 115 S.Ct. at 1633, 1630 (setting "judi-

cially enforceable outer limit[ ]" of commerce clause power by holding that "the proper test requires an analysis of whether the regulated activity 'substantially affects' interstate commerce."). By requiring the courts to decide First Amendment free exercise cases under a rule of decision which the Supreme Court has expressly rejected as inappropriate, Congress has usurped the Supreme Court's authority to determine the scope and meaning of the First Amendment and has violated the separation of powers.

As Justice Scalia recently explained for the Court in *Plaut v. Spendthrift Farm, Inc.*, —— U.S. ——, 115 S.Ct. 1447, 131 L.Ed.2d 328 (1995),

> the doctrine of separation of powers is a *structural safeguard* rather than a remedy to be applied only when specific harm, or risk of specific harm, can be identified. In its major features ... it is a prophylactic device, establishing high walls and clear distinctions because low walls and vague distinctions will not be judicially defensible in the heat of interbranch conflict.

*Plaut*, —— U.S. at ——, 115 S.Ct. at 1463. Congress has never before sought to change the Court's allocation of constitutional power by redefining, for all cases involving a specific constitutional right, the relationship between the individual right asserted and the countervailing power of government. Such action far exceeds the scope of Congress's § 5 authority to legislate to enforce the Fourteenth Amendment.

*Morgan* is the most important case defining the parameters of Congress's power under § 5, and the case which sets out the framework applied in later decisions. *Morgan* involved a challenge to section 4(e) of the Voting Rights Act, which prohibited the states from imposing certain literacy tests as a condition of eligibility to vote. The statutory ban was a response to the Supreme

---

11. The United States' and the plaintiffs' steadfast insistence that RFRA does not legislate an interpretation of the constitution indicates their understanding that such Congressional action would violate the separation of powers.

12. Under the expansive view of Congress's § 5 power favored by the United States, the Court's holding in *Adarand* might also be open to legisla-

tive reversal by Congress. Arguably, Congress could determine that intermediate level scrutiny of "benign" classifications would promote the goals of equal protection. *See* —— U.S. at ——, 115 S.Ct. at 2122 (Stevens, J., dissenting). Like *Smith*, however, *Adarand* defines constitutional boundaries by requiring the courts to review government action under strict scrutiny where racial classifications are present.

Court's holding in *Lassiter v. Northampton Election Bd.*, 360 U.S. 45, 79 S.Ct. 985, 3 L.Ed.2d 1072 (1959), that such literacy tests did not, in themselves, violate the Fourteenth Amendment. In *Morgan*, the Court described *Lassiter* as standing for the proposition that literacy tests were "not in all circumstances prohibited by the first sections of the Fourteenth and Fifteenth Amendments," 384 U.S. at 649, 86 S.Ct. at 1722, and sustained the federal ban on such tests as a valid exercise of Congress's power under § 5. In so doing, the Court emphasized the "specially informed legislative competence" of Congress to undertake "a general appraisal of literacy requirements for voting," and, based on that appraisal, to determine that literacy tests were, in fact discriminatory.[13] 384 U.S. at 656, 655, 86 S.Ct. at 1726.

The enactment of RFRA can in no sense be said to involve the "specially informed legislative competence" of Congress. The Congressional "findings" set forth in 42 U.S.C. § 2000bb include the pronouncements that "governments should not substantially burden religious exercise without compelling justification," 42 U.S.C. § 2000bb(a)(3), and that "the compelling interest test ... is a workable test for striking sensible balances between religious liberty and competing governmental interests," 42 U.S.C.

§ 2000bb(a)(5).[14] *Compare Smith II*, 494 U.S. at 885, 110 S.Ct. at 1603–04 (applying the compelling interest test in free exercise cases "contradicts both constitutional tradition and common sense"); 494 U.S. at 887, 110 S.Ct. at 1604–05 n. 4 and 888 n. 4, ("courts must not presume to determine the place of a particular belief in a religion or the plausibility of a religious claim," but, because of the range of religious practices, "dispensing with a 'centrality' requirement is utterly unworkable."). As Judge McMillian of the Court of Appeals for the Eighth Circuit has pointed out in dissent, "the language of the findings portrays Congress, not as a political organ well-suited to conduct the business of empirical research and policy implementation, but as a super-Supreme Court." *Hamilton v. Schriro*, 74 F.3d 1545, 1566 (8th Cir.1996) (dissenting opinion) (footnote omitted). Unlike the situation in *Morgan*, where Congress legislated against a certain discrete type of state regulation which might, as a factual matter, be viewed discriminatory, Congress here seeks to replace the Supreme Court's constitutional judgment with its own.[15] In RFRA Congress has gone beyond the business of legislation and entered the field of constitutional interpretation.

This Court is aware of no other statute by which Congress resurrected a judicially-

---

**13.** Likewise, *City of Rome* involved challenges to the Voting Rights Act, which, the Court observed, Congress had enacted "after making an extensive investigation" of discriminatory practices. *City of Rome*, 446 U.S. at 174, 100 S.Ct. at 1560.

**14.** The United States points out that Congress engaged in extensive legislative hearings before enacting RFRA. *See, e.g.,* Memo. of United States at 13–15. Nevertheless, the "findings" set forth in the statute itself are legal conclusions, rather than genuine factual findings. The findings set forth in 42 U.S.C. § 1996a, which reversed the result in *Smith II* by protecting the traditional ceremonial use of peyote, provide an instructive comparison. The first two findings are as follows:

The Congress finds and declares that—
(1) for many Indian people, the traditional ceremonial use of the peyote cactus as a religious sacrament has for centuries been integral to a way of life, and significant in perpetuating Indian tribes and cultures;
(2) since 1965, this ceremonial use of peyote by Indians has been protected by Federal regulation ...

42 U.S.C. § 1996a(a) (1994).

**15.** RFRA does not prohibit the states from enacting legislation of any particular type. Rather, it exposes any and all generally applicable state legislation to the compelling interest test when a free exercise challenge is raised. The Supreme Court stated in *Smith II* that "to make an individual's obligation to obey [generally applicable prohibitions of socially harmful conduct] contingent upon the law's coincidence with his religious beliefs, except where the State's interest is 'compelling' ... contradicts both constitutional tradition and common sense." 494 U.S. at 885, 110 S.Ct. at 1603. Because "principles of federalism that might otherwise be an obstacle to congressional authority are necessarily overridden by the power to enforce the Civil War Amendments 'by appropriate legislation,'" *City of Rome*, 446 U.S. at 179, 100 S.Ct. at 1562, federalism is not a sufficient objection to RFRA. Because RFRA violates the separation of powers by legislating an interpretation of the constitution, however, it is not "appropriate legislation" that can intrude upon the authority of the states. U.S. Const., Amend. XIV, § 5.

rejected standard of judicial review for an entire class of constitutional cases, and consequently has found no authority directly holding that Congress may not do so.[16] There is, however, one indication in Supreme Court jurisprudence that Congress's action violates the principle of separation of powers. In *United States v. Klein,* 13 Wall. 128, 20 L.Ed. 519 (1872), the Supreme Court struck down a statute which provided that Presidential pardons granted to participants in the civil war could not be considered as evidence in suits against the United States for property captured or abandoned during the war. The Supreme Court had previously affirmed judgments against the United States based, in part, upon the effect of the pardons. 13 Wall. at 143, 20 L.Ed. 519. In *Klein,* the Supreme Court held that the challenged statute's "great and controlling purpose is to deny to pardons granted by the President the effect which this court had adjudged them to have." 13 Wall. at 145, 20 L.Ed. 519. Observing that as a result of the statute it was "forbidden to give the effect to evidence which, in its own judgment, such evidence should have, and is directed to give it an effect precisely contrary," the Supreme Court concluded that Congress must have "inadvertently passed the limit which separates the legislative from the judicial power." 13 Wall. at 147, 20 L.Ed. 519. Rejecting the notion that "the legislature may prescribe rules of decision to the Judicial Department of the government in cases pending before it," the Court declined to apply the statute. 13 Wall. at 146, 20 L.Ed. 519.

The scope of the decision in *Klein* is unclear. *See Plaut,* —— U.S. at ——, 115 S.Ct. at 1452; *Robertson v. Seattle Audubon Society,* 503 U.S. 429, 441, 112 S.Ct. 1407, 1414–15, 118 L.Ed.2d 73 (1992). Unlike RFRA, the statute challenged in *Klein* effectively determined the outcome of particular cases pending against the federal government, resolving them in the government's favor.

RFRA, by contrast, does not determine the result in specific cases, but supplies a rule for deciding them.[17] Nevertheless, *Klein* demonstrates that there are separation of powers constraints upon Congress's authority to trammel the judiciary's exercise of its independent judgment. For the reasons stated earlier, RFRA violates those constraints.

This Court acknowledges that most courts which have addressed the question have held RFRA to be constitutional. *See, e.g., E.E.O.C. v. The Catholic University of America,* 83 F.3d 455 (D.C.Cir.1996), 1996 WL 246568, (D.C.Cir.); *Flores v. City of Boerne,* 73 F.3d 1352 (5th Cir.1996); *Sasnett v. Wisconsin Department of Corrections,* 891 F.Supp. 1305 (W.D.Wis.1995), *appeal docketed,* No. 95–3924 (7th Cir.); *Belgard v. Hawai'i,* 883 F.Supp. 510 (D.Haw.1995). Nevertheless, this Court finds the reasoning of these cases unpersuasive. Unlike the Courts of Appeals for the District of Columbia Circuit and for the Fifth Circuit, this Court is unpersuaded by the argument that "[t]he Act does nothing more than substitute a statutory test for the constitutional test that *Smith [II]* found not to be mandated by the Free Exercise Clause in cases where the right of free exercise was burdened by a neutral law of general applicability." *Catholic University,* 83 F.3d 455, 469 LEXIS 11205, *45. *Accord Flores,* 73 F.3d at 1363. As earlier stated, RFRA requires the courts to apply the compelling interest test in all free exercise cases, and, by so doing, substitutes Congress's judgment about the proper meaning of the free exercise guarantee for that of the Supreme Court. Moreover, RFRA effectively insulates the free exercise clause of the First Amendment from judicial consideration. Section 5 of the Fourteenth Amendment does not authorize Congress to violate the separation of powers in this manner. Because Congress lacked power to enact RFRA, the statute cannot form the basis of a cause of action in the present case.

---

16. "That prolonged reticence would be amazing if such interference were not understood to be constitutionally proscribed." *Plaut v. Spendthrift Farm, Inc.,* —— U.S. ——, 115 S.Ct. 1447, 1458, 131 L.Ed.2d 328 (1995).

17. The compelling interest test has been described as "strict in theory, but fatal in fact." *Fullilove v. Klutznick,* 448 U.S. 448, 519, 100 S.Ct. 2758, 2795–96, 65 L.Ed.2d 902 (Marshall, J. concurring in the judgment). *But see Adarand Constructors, Inc. v. Pena,* —— U.S. ——, ——, 115 S.Ct. 2097, 2117, 132 L.Ed.2d 158 (1995).

*Conclusion*

For the foregoing reasons, the defendants' motion to dismiss Count I of the Complaint is *granted.* The defendants' motion to dismiss Counts II through X are *denied.* Because of the importance of this issue and the diversity of opinion on it, and in view of the fact that its prompt litigation on appeal would materially advance the determination of the case as a whole, an order under 28 U.S.C. § 1292(b) will be entered separately.

It is so ordered.

## CERTIFICATION ORDER

This Court's Memorandum Opinion and Order of even date granting, in part, and denying, in part, the defendants' motion to dismiss the Complaint for failure to state a cause of action involves a controlling question of law, namely the constitutionality of the Religious Freedom Restoration Act, 42 U.S.C. § 2000bb, as to which there is substantial ground for difference of opinion. Because resolution of this statutory issue may obviate the need for this Court to address the plaintiffs' remaining claims for relief, all of which are constitutional, an immediate appeal from the order addressing the constitutionality of the statute may materially advance the ultimate termination of the litigation.

Therefore, this Court's order granting dismissal of the plaintiffs' claim based upon the Religious Freedom Restoration Act *SHALL BE*, and it hereby *IS*, certified as a final order for purposes of appeal under 28 U.S.C. § 1292(b).

It is so ordered.