RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206
ELECTRONIC CITATION: 2000 FED App. 0262P (6th Cir.)
File Name: 00a0262p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

LA VOZ RADIO DE LA
COMMUNIDAD, MIGUEL
TORO, LEANDRA ABRIU,
ROSALIA POLANCO, ISRAE
LUCATERO, KEYLA ACOSTA,
MANUEL VALLES, INGRIS
BRANCH, BERNARDO MOYA,
OLGA GARCIA, HENRY
RODRIGUEZ, JOSE L. BAEZ,
ANGEL CORIANO, CRUZ
CORIANO, BIENVENIDA
RODRIGUEZ, MIGUEL RUIZ,
PEDRO PENA, FRANCISCA
ROMERO, LUZ MARIA
MONTENEGRO, RAFELA
FERRERA, and JUSTINA
FERNANDEZ,
   *Plaintiffs-Appellants,*

     *v.*

FEDERAL COMMUNICATIONS
COMMISSION, and JAMES
BRIDGEWATER,
   *Defendants-Appellees.*

No. 99-1565

1

Appeal from the United States District Court
for the Western District of Michigan at Grand Rapids.
No. 98-00867—Wendell A. Miles, District Judge.

Argued:  June 21, 2000

Decided and Filed:  August 2, 2000

Before:  KEITH, DAUGHTREY, and GILMAN, Circuit
Judges.

————————————

**COUNSEL**

**ARGUED:**  Patrick M. Edwards, LAW OFFICES OF K. S.
ERNST, Detroit, Michigan, for Appellants.  Mark S. Davies,
UNITED STATES DEPARTMENT OF JUSTICE, CIVIL
DIVISION, APPELLATE STAFF, Washington, D.C., for
Appellees. **ON BRIEF:** Kevin S. Ernst, LAW OFFICES OF
K. S. ERNST, Detroit, Michigan, for Appellants.  Mark S.
Davies, Jacob M. Lewis, UNITED STATES DEPARTMENT
OF JUSTICE, CIVIL DIVISION, APPELLATE STAFF,
Washington, D.C., for Appellees.

————————————

**OPINION**

————————————

  RONALD LEE GILMAN, Circuit Judge.  La Voz de la
Communidad, an unlicensed radio "microbroadcaster" based
in Grand Rapids, Michigan, joined by its owner and a number
of its listeners, brought suit in the United States District Court
for the Western District of Michigan, requesting that the
district court enjoin the Federal Communications
Commission (FCC) from taking any action to stop La Voz
from broadcasting without a license.  The district court
dismissed the action for lack of subject matter jurisdiction.
For the reasons set forth below, we **AFFIRM** the judgment of
the district court.

## I.  BACKGROUND

The Communications Act of 1934 generally prohibits radio broadcasting by unlicensed persons.  *See* 47 U.S.C. § 301. Congress has vested the FCC with the authority to issue radio broadcast licenses to applicants upon a showing that the "public convenience, interest, or necessity will be served thereby."  47 U.S.C. § 307(a).

FCC regulations classify FM radio broadcast licenses as Class A, Class B, Class C, or Class D, depending on the station's transmission power, antenna height, and the area or place from which the broadcasts emanate. *See* 47 C.F.R. §§ 73.210-.211. Before 1978, the FCC was amenable to granting Class D licenses to low-power "microbroadcasters," but that year it adopted a regulation effectively preventing new Class D stations from operating, except in Alaska. *See* 47 C.F.R. § 73.512(c) (providing that no new Class D applications would be accepted, except in Alaska or by existing Class D stations seeking to change frequency).

A number of unlicensed microbroadcasters around the country took this regulation to mean that the FCC was "being used as the tool of powerful broadcast corporations" that wished to maintain cartel-like control over the airwaves, at the cost of suppressing potential competitors and depriving the listening public of "low-cost broadcasting on community issues as an alternative to mainstream perspectives."  They concluded that the FCC's refusal to grant them broadcast licenses violated their First Amendment rights as well as the rights of their prospective listeners. *See United States v. Any and All Radio Station Transmission Equip. (Strawcutter)*, 204 F.3d 658, 662 (6th Cir. 2000).  Essentially, they resorted to self-help by broadcasting without licenses.

During the pendency of the present appeal, the FCC changed its position on microbroadcasting. *See In re Creation of Low Power Radio Serv.*, FCC 00-19, 15 FCCR 2205, at ¶ 1 (released January 27, 2000) (authorizing, among other things, the licensing of low-power FM stations operating at a maximum of 10 watts).  Notwithstanding this change in

policy, however, microbroadcasters who had operated when it was illegal for them to do so will generally not be eligible for broadcasting licenses. *See id.*, at ¶¶ 51-55 (announcing that microbroadcasters who had broadcast without licenses in the past will now be eligible for low-power broadcast licenses, but only if they voluntarily ceased broadcasting no later than February 26, 1999 "without specific direction to terminate by the FCC," or ceased broadcasting within 24 hours after being advised to do so by the FCC).

On September 11, 1998, La Voz filed an application with the FCC for a radio broadcast license. That same day, La Voz began broadcasting without a license from a church in Grand Rapids at a frequency of 90.9 megahertz. Five days later, on September 16, 1998, the FCC returned La Voz's application because it was "grossly deficient." Specifically, the application's complete lack of engineering data left the FCC unable to evaluate the station's potential hazards to aircraft, the technical impact of La Voz's proposed radio station on other existing or proposed stations, and whether La Voz and its transmitter complied with pertinent zoning and land use ordinances.

In a letter to the FCC dated October 8, 1998, La Voz conceded that it was an "unlicensed microbroadcaster," but asserted that it "retain[ed] a First Amendment right to broadcast under 100 watts of power." Because the FCC's policy at the time was to uniformly deny licenses to microbroadcasters, the letter continued, La Voz would simply broadcast without a license.

On October 22, 1998, and again on November 4, 1998, the FCC's Detroit field office received complaints about an unlicensed FM radio station in Grand Rapids. FCC agents confirmed that the station was broadcasting from a church called Iglesia de Cristo Misionera, Inc. (Missionary Church of Christ, Inc.), in Grand Rapids. The broadcast's strength of 31,660 microvolts per meter at a distance of 131 meters was well in excess of the maximum permitted for nonlicensed transmissions (250 microvolts per meter at a distance of 3

mark for at least two reasons. First of all, the Communications Act is not facially unconstitutional. *See Strawcutter*, 204 F.3d at 666. And second, the method prescribed by Congress for the review of FCC actions does not prevent La Voz from challenging the Communications Act's constitutionality. It does, however, prevent La Voz from making that challenge in the district court as part of a preemptive action designed to stop the FCC from availing itself of its statutory remedies against unlicensed microbroadcasters.

### III. CONCLUSION

For all of the reasons set forth above, we **AFFIRM** the judgment of the district court.

microbroadcasters demanding that they stop broadcasting, but the letters were not "order[s] to cease and desist" within the meaning of 47 U.S.C. § 402(b)(7), for which review is committed to the District of Columbia Circuit. *See* 47 U.S.C. § 312(c) (listing the procedural requirements for an FCC cease-and-desist order). Furthermore, the microbroadcasters in *Strawcutter* had never applied for broadcasting licenses.

It is one thing to say, as this court did in *Strawcutter*, that a microbroadcaster may raise constitutional arguments as a shield to defend itself in a forfeiture action brought by the government when the forfeiture action was not preceded by any formal administrative action. But it is entirely another thing to say that a microbroadcaster can initiate an action in the district court as a sword against the possibility of adverse administrative action in the future.

As La Voz recognizes, Congress has equipped the FCC with an impressive arsenal of remedies against illegal broadcasters, including "in-house" administrative forfeitures, administrative cease-and-desist orders, injunctive relief, in rem forfeiture proceedings in the district court, and criminal penalties. The effectiveness of those remedies would be largely nullified if microbroadcasters could simply run to the district court and enjoin the FCC from utilizing them. Allowing what is essentially a claim for prospective relief against the FCC to be dressed up as a *Bivens* claim for retrospective relief against a specific FCC employee would have largely the same effect. It would also disregard Congress's directive that review of the FCC's administrative actions should occur in the courts of appeals (and, in many cases, specifically in the District of Columbia Circuit).

La Voz correctly observes that persons need not apply for a license under a facially unconstitutional licensing statute in order to challenge the statute's constitutionality. *See Staub v. City of Baxley*, 355 U.S. 313, 319 (1958) (reversing a criminal conviction for the unlicensed solicitation of memberships in a dues-paying organization, even though the defendant had not applied for a license). But this observation misses the

meters). With the station's self-described "owner," Miguel Toro, in attendance, the FCC agents determined that the transmitter's output power was 100 watts. The agents warned Toro and the station operator on duty that broadcasting without a license was a violation of 47 U.S.C. § 301, which carried with it the possibility of numerous penalties.

On November 9, 1998, James Bridgewater, the FCC's Detroit district director, sent Toro a letter. In the letter, Bridgewater cautioned that operating an unlicensed radio transmitter violates 47 U.S.C. § 301, and that the possible penalties for unlicensed broadcasting included fines and imprisonment. The letter demanded that La Voz discontinue broadcasting immediately.

La Voz in fact stopped broadcasting upon receipt of the letter, but then resumed broadcasting at some point between November 21 and November 25, 1998. On November 25, 1998, the FCC received another complaint about La Voz's broadcasts. FCC agents tested La Voz's transmissions on December 2, 1998, and confirmed that La Voz was continuing to broadcast at a strength (48,602 microvolts per meter at a distance of 144 meters) greatly in excess of the maximum permitted for nonlicensed radio transmissions. The broadcasts were originating from the same church, although the antenna had apparently been moved from the front to the back of the building.

Also on December 2, 1998, La Voz filed another application for a broadcasting license. The application was accompanied by a cover letter, in which La Voz requested "a number of waivers of FCC rules" for good cause. La Voz's asserted "good cause" was the standard microbroadcaster argument that the FCC's refusal to grant broadcast licenses to microbroadcasters violated the First Amendment and was inconsistent with Congress's directive, set forth at 47 U.S.C. § 303(g), that the FCC "generally encourage the larger and more effective use of radio in the public interest."

La Voz also argued that because a significant portion of its broadcasting is religious in nature, and because the tenets of

Toro's religious faith require him to evangelize to the largest possible audience, the FCC's refusal to allow him to broadcast violates the Religious Freedom Restoration Act (RFRA), 42 U.S.C. §§ 2000bb-2000bb-4. (In addition to its religious-themed programming, La Voz's lineup included public service announcements and "regular programs concerning drug abuse prevention, child abuse, domestic violence, [and] housing needs, [all] particularly geared to the Hispanic Community.")

On December 7, 1998, five days after it filed its second license application, La Voz, joined by Toro and a number of La Voz's listeners, went on the offensive by filing the present action. The complaint was captioned "Verified Complaint for Temporary Restraining Order and/or Preliminary Injunction under the Religious Freedom Restoration Act, and *Bivins* [sic] Action." Despite the suggestion that it was asserting a claim pursuant to the doctrine announced in *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971)—and this is the only conceivable reason why FCC District Director Bridgewater was named as a defendant—the body of La Voz's complaint contains no factual allegations concerning the actions of any specific government employee, including Bridgewater.

La Voz's requested relief was "an injunctive order allowing [La Voz] to broadcast [its] religious message and enjoining the government from civilly or criminally sanctioning [La Voz] during the pendency of the action, in addition [sic] [La Voz is] seeking costs including reasonable attorneys fees." On February 9, 1999, the government responded by moving to dismiss the action for lack of subject matter jurisdiction. The gravamen of the government's argument was that Congress had made FCC licensing decisions reviewable only by the United States Court of Appeals for the District of Columbia. After finding the government's argument meritorious, the district court granted the motion. This appeal followed.

*United States*, 120 S. Ct. 2326, 2328 (2000) (reaffirming the principle that Congress may not legislatively supersede decisions of the Supreme Court interpreting and applying the Constitution); *City of Boerne v. Flores*, 521 U.S. 507, 517-21 (1997) (RFRA case) (same); *Keeler v. Mayor & City Council of Cumberland*, 928 F. Supp. 591 (D. Md. 1996) (concluding that RFRA is unconstitutional because it violates separation-of-powers principles)), nothing in RFRA purports to specifically grant the district courts jurisdiction to hear RFRA claims.

Rather, the statute provides that a person who believes that his "religious exercise" has been "burdened" in violation of RFRA "may assert that violation as a claim or defense in a judicial proceeding . . . ." 42 U.S.C. § 2000bb-1(c). It does not provide that the "judicial proceeding" must be in the district court as opposed to a designated court of appeals. *See Radio Luz*, 88 F. Supp. 2d at 376 (rejecting the argument that RFRA grants the district courts jurisdiction to entertain religion-based challenges to the FCC's policy of not granting licenses to microbroadcasters).

We also note the contrast between the present case and *United States v. Any and All Radio Station Transmission Equip. (Strawcutter)*, 204 F.3d 658 (6th Cir. 2000). In *Strawcutter*, this court held that when the FCC does not proceed administratively against an unlicensed microbroadcaster, but instead initiates an in rem action in the district court seeking the forfeiture of offending broadcasting equipment, the microbroadcaster is not precluded from challenging the legal basis of the government's forfeiture case in the district court. *Strawcutter* rejected the government's argument that the microbroadcasters were barred from raising their constitutional challenges in the district court simply because they could have raised them before the FCC at some earlier time.

Of critical importance in *Strawcutter* was the fact that no FCC order was being challenged. *See Strawcutter*, 204 F.3d at 667. In *Strawcutter*, the FCC sent letters to two

by a microbroadcaster, concluding that it was an impermissible "end-run around the statutory scheme established in the Federal Communications Act." *Id*. at 376. The district court reasoned that "it would defeat that statutory scheme to allow plaintiffs to file preemptive suits in the district court, in anticipation of an adverse decision by the FCC," and thus concluded that the Communications Act did not give it "jurisdiction to hear plaintiffs' claims against the FCC and to grant the injunctive relief plaintiffs seek in order to avoid the outcome of an FCC order." *Id*. at 377.

La Voz also argues that because it was asserting a *Bivens* claim (i.e., a claim that an agent of the federal government had violated its constitutional rights), the district court had jurisdiction pursuant to 28 U.S.C. § 1331, which provides that "[t]he district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States." This argument is without merit. Putting to one side La Voz's failure to assert a cognizable *Bivens* claim and FCC District Director Bridgewater's obvious entitlement to qualified immunity, litigants "may not bypass the specific method that Congress has provided for reviewing adverse agency action simply by suing the agency in federal district court under [§] 1331 . . . ; the specific statutory method, if adequate, is exclusive." *General Finance Corp. v. FTC*, 700 F.2d 366, 368 (7th Cir. 1983) (Posner, J.).

As numerous courts have recognized, "federal statutes frequently assign jurisdiction to a court other than the federal district courts," and when they do so, "Congress negates district court jurisdiction under § 1331." *ErieNet, Inc. v. Velocity Net, Inc.*, 156 F.3d 513, 518-19 (3d Cir. 1998). There is no apparent reason why the method for review set forth in 47 U.S.C. § 402(b) is inadequate, and La Voz has not suggested any.

La Voz's attempt to rely on RFRA as the basis for district court jurisdiction is also unavailing. Assuming for the sake of argument that RFRA is constitutional as applied to the federal government (which we doubt, *see, e.g., Dickerson v.*

Although not directly relevant to the present appeal, the government subsequently filed a complaint of its own, seeking the in rem forfeiture of La Voz's broadcasting equipment pursuant to 47 U.S.C. § 510. The district court granted the government's motion for summary judgment. La Voz filed a notice of appeal, but later voluntarily dismissed the appeal pursuant to Rule 42(b) of the Federal Rules of Appellate Procedure.

## II. ANALYSIS

In relevant part, 47 U.S.C. § 402 provides as follows:

§ 402. Judicial review of Commission's orders and decisions

(a) Procedure -- Any proceeding to enjoin, set aside, annul, or suspend any order of the Commission under this chapter (except those appealable under subsection (b) of this section) shall be brought as provided by and in the manner prescribed in chapter 158 of Title 28.

(b) Right to appeal

Appeals may be taken from decisions and orders of the Commission to the United States Court of Appeals for the District of Columbia in any of the following cases:

(1) By any applicant for a construction permit or station license, whose application is denied by the Commission.

. . .

(6) By any other person who is aggrieved or whose interests are adversely affected by any order of the Commission granting or denying any application described in paragraphs (1) to (4) and (9) of this subsection.

(7) By any person upon whom an order to cease and desist has been served under section 312 of this title.

The statute referred to in 47 U.S.C. § 402(a) provides that "[t]he court of appeals (other than the United States Court of Appeals for the Federal Circuit) has exclusive jurisdiction to enjoin, set aside, suspend (in whole or in part), or to determine the validity of . . . all final orders of the Federal Communications Commission made reviewable by section 402(a) of title 47 . . . ." 28 U.S.C. § 2342. Congress apparently built these two separate "roads to judicial review" (§ 402(a) versus § 402(b)) for the sole purpose of sparing licensees who wished to challenge an adverse FCC decision arising "out of a proceeding not instituted by the licensee" the burden of litigating the appeal in Washington, D.C. *Scripps-Howard Radio, Inc. v. FCC*, 316 U.S. 4, 8 n.3, 15-16 (1942).

In *Rippe v. FCC*, 528 F.2d 771, 772 (6th Cir. 1976) (per curiam), this court recognized that the FCC's denial of an application for a broadcast license fell within the coverage of 47 U.S.C. § 402(b), and was thus subject to review only in the United States Court of Appeals for the District of Columbia. The present case appears to be of exactly the type that Congress intended be resolved in the first instance by the FCC, with review available afterward in the District of Columbia Circuit. *See, e.g.*, *Cook, Inc. v. United States*, 394 F.2d 84, 87 (7th Cir. 1968) (concluding that decisions that are 'ancillary' to the exercise of the FCC's licensing power, such as the return of an application for a broadcast license, are reviewable only by the District of Columbia Circuit); Michael Botein, *Judicial Review of FCC Action*, 13 CARDOZO ARTS AND ENT. L.J. 317, 320-21 (1995) (noting as a general matter that under the "mutually exclusive" provisions of §§ 402(a) and 402(b), "review of any FCC formal action other than a licensing decision occurs pursuant to section 402(a)," and can be had in any circuit in which venue is proper, but that petitions for review of licensing decisions "are cognizable exclusively in the District of Columbia Circuit.").

Although La Voz presumably disagrees with the specific, immediate reason for the FCC's denial of its application (the lack of adequate information), its real complaint is with the fact that the FCC almost surely would have rejected the application even if the information provided had not been "grossly deficient." At the time, after all, the FCC was not granting licenses to any microbroadcasters. But if La Voz wished to argue that the FCC's policies regarding microbroadcasters were unconstitutional, there is no reason why its argument could not have been considered by the District of Columbia Circuit.

La Voz also argues that the provisions of 47 U.S.C. § 402(b) do not apply because the FCC's rejection of its application was not a "final order" denying it a broadcast license. This argument is foreclosed, however, not only by this court's decision in *Rippe*, but also by the rule that when review of agency action is expressly committed to a designated court of appeals, that court of appeals has exclusive jurisdiction over "any suit seeking relief that might affect" its future statutory power of review. *Telecommunications Research & Action Ctr. v. FCC*, 750 F.2d 70, 75 (D.C. Cir. 1984). *See also Cook*, 394 F.2d at 87 (concluding that decisions "ancillary" to the exercise of the FCC's licensing power may be reviewed only in the District of Columbia Circuit).

La Voz repeatedly asserts that not allowing it to pursue a preemptive action against the FCC in the district court would deny it the ability to obtain judicial review. But this argument ignores the fact that microbroadcasters can obtain precisely the review they seek in the United States Court of Appeals for the District of Columbia after a final administrative action by the FCC. This is the review process that the Communications Act of 1934 requires. *See* 47 U.S.C. § 402.

A recent case directly on point is *Radio Luz v. FCC*, 88 F. Supp. 2d 372 (E.D. Pa. 1999), *aff'd*, No. 99-1668, 213 F.3d 629 (3d Cir. 2000) (unpublished), in which the district court dismissed an essentially identical preemptive action brought